BCCI HOLDINGS (LUXEMBOURG),
S.A., et al., Appellees,

v.

Abdul Raouf Hasan KHALIL,
Appellant.

No. 99–7171.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 27, 2000.

Decided May 30, 2000.

Stephen R. Johnson argued the cause for appellant. With him on the briefs were James P. Linn and T. Jay Barrymore.

Eric L. Lewis argued the cause for appellees. With him on the brief was A. Katherine Toomey.

Before: EDWARDS, Chief Judge, HENDERSON and ROGERS, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

HARRY T. EDWARDS, Chief Judge:

This case involves a civil action resting on the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.* (1994), common law fraud, unjust enrichment, and conversion. The lawsuit was brought by appellees, fiduciaries appointed on behalf of the Bank of Credit and Commerce International ("BCCI") to liquidate the principal BCCI holdings and recover assets on behalf of depositors and innocent creditors, against appellant, Abdul Raouf Hasan Khalil, and three co-conspirators. The District Court found Mr. Khalil liable on many, but not all, of the claims arising under RICO, common law fraud, unjust enrichment, and conversion. The total non-duplicative amount of actual damages entered in favor of appellees against Mr. Khalil was $388,-402,534. The District Court trebled this amount pursuant to 18 U.S.C. § 1964(c) (1994), for a total judgment of $1,165,207,-602 against Mr. Khalil.

On appeal, Mr. Khalil raises two principal issues: First, Mr. Khalil claims that the District Court erred under Federal Rules of Civil Procedure 39(b) in denying his late request for a jury trial; second, Mr. Khalil contends that the District Court erred in holding that appellant's alleged RICO and common law tort violations were the legal cause of BCCI's losses. With one exception, we find no merit in Mr. Khalil's arguments.

Appellant's disputed motion for a jury trial was filed more than a year late, after discovery had been concluded and after a trial date had been set. The trial judge denied the motion because of prejudice to the plaintiff, who had prepared for a bench trial. The trial judge also noted that expediency would be served in holding to the existing trial schedule, to avoid undue delay and potential complications with other trials involving related issues. In short, the District Court found that counsel's inexcusable neglect in failing to request a jury trial in a timely fashion waived defendant's right to a jury trial. We find no error in this judgment, for the trial judge acted within the discretion afforded her under Rule 39(b).

We also affirm most of the District Court's judgments on the merits. As the

court's opinion indicates, *see BCCI Holdings (Luxembourg), Societe Anonyme v. Khalil ("Khalil")*, 56 F.Supp.2d 14 (D.D.C. 1999), there is ample evidence in the record to show but-for and proximate causation, supporting most of the judgments on the RICO and the common law tort claims. We can find no record evidence, however, to support the District Court's finding that Mr. Khalil is liable to BCCI for damages in the amount of $62,021,193 for certain silver and copper trading losses.

We reverse the District Court's judgment for damages resting on the silver and copper trading losses. We affirm the District Court's judgment on all other points. The case will be remanded for the District Court to recalculate the damages that are due to appellees.

## I. FACTS

This lawsuit was spawned by BCCI's international collapse, which was the largest international bank failure in history. *See Khalil*, 56 F.Supp.2d at 20. BCCI's court-appointed liquidators filed a complaint on July 3, 1995 to recover damages suffered by BCCI as a result of Mr. Khalil's alleged violations of RICO, common law fraud, unjust enrichment, and conversion. The liquidators charged that Mr. Khalil participated in a conspiracy with BCCI's management that allowed BCCI secretly to acquire ownership and maintain control of First American Corporation and First American Bankshares, Inc. (collectively "First American"). This illegal scheme operated through the use of nominee shareholders—like Mr. Khalil—who allowed BCCI to hide financial losses from bank regulators.

Mr. Khalil is a wealthy Saudi Arabian businessman and former government official who deposited large amounts of money in BCCI. He may have been BCCI's largest depositor. *See id.* at 21. In their complaint, the liquidators claimed that, in the late 1970s and 1980s, BCCI's former management sought out Mr. Khalil and paid him large sums of money in exchange for the use of his name and prestige to disguise three schemes: (1) Mr. Khalil agreed to act as a nominee shareholder of First American Bank's parent corporation to disguise BCCI's illegal acquisition of an American bank without required regulatory approval; (2) Mr. Khalil agreed to serve as a nominee shareholder of BCCI Holdings to disguise the truth about BCCI's artificially and misleadingly inflated capital resources and support; and (3) Mr. Khalil agreed to allow BCCI to use his name, both individually and on behalf of his corporations, to disguise risky investments and to create the false impression that BCCI was servicing large loans that were actually in default. *See id.* The liquidators contended that Mr. Khalil's assent to these schemes prevented BCCI's true financial condition from becoming apparent much earlier, stopped BCCI from closing down much sooner, and thus precipitated significant financial losses for thousands of creditors and depositors.

Not all of the liquidators' claims against Mr. Khalil rested on a passive view of Mr. Khalil's relationship with BCCI. The liquidators also asserted that Mr. Khalil and Mr. Syed Ziauddin Ali Akbar conspired to loot BCCI's assets so that they could create and fund a commodities brokerage that they called Capcom UK. Mr. Akbar, who was a BCCI officer from 1976 to 1986 and was in charge of BCCI's Treasury Division from 1982 to 1986, created loans in BCCI's books to Mr. Khalil and his companies. Mr. Akbar never intended, however, for these loans to be repaid. In particular, between October 1984 and December 1984, Mr. Akbar transferred $100,000,000 to Capcom that was not authorized by Mr. Akbar's superiors. Mr. Akbar also transferred $25,000,000 to Capcom in June 1985 and $136,000,000 to Capcom between January and April 1986. *See id.* at 42–43. For his part, on August 20, 1985, Mr. Khalil negotiated a $12.5 million check from BCCI as a payment for his share of the "profits" from the trading operations, received a $15 million "parting gift" on July

3, 1987 that he had cajoled when he withdrew his deposits from BCCI, and, on June 25, 1987, coaxed a $17,000,000 "loan" from BCCI to General Securities Corp., a company co-owned by Mr. Khalil and Mr. Akbar that had an account at Capcom. *See id.* at 43–45.

Mr. Khalil does not disavow this general characterization of the facts. And he does not claim that he was innocent. His appeal is based on two much more narrow grounds. The first ground centers on the District Court's denial of Mr. Khalil's request for a jury trial. The liquidators filed their complaint on July 3, 1995, and Mr. Khalil filed his answer on February 10, 1997. Subsequently, on April 21, 1998, the parties had a status conference and agreed to schedule a bench trial to begin on January 25, 1999. On April 24, 1998, Mr. Khalil's attorney filed a motion for a jury trial, claiming that counsel had inadvertently omitted a jury demand from Mr. Khalil's answer to the complaint. Under FED. R. CIV. P. 38(b), the jury demand was over a year late; it was therefore deemed "waived" under FED. R. CIV. P. 38(d). Mr. Khalil's attorney argued, however, that the tardy demand for a jury trial could be granted by the District Court under FED. R. CIV. P. 39(b).

On October 8, 1998, guided by the Supreme Court's decision in *Pierce v. Underwood,* 487 U.S. 552, 562, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), the District Court denied Mr. Khalil's motion for a jury trial. The court found that (1) Mr. Khalil's lawyer's claimed inadvertent omission was not excusable, given that counsel had taken so long to discover the omission, discovery was complete, the deadline for motions had passed, and the court and the opposing party had prepared for a bench trial; (2) plaintiffs would be significantly prejudiced if the court were to grant Mr. Khalil's tardy request for a jury trial, because plaintiffs had premised many of their decisions in discovery upon their understanding that there would be a bench trial; (3) a bench trial would be much more efficient

than a jury trial; (4) granting Mr. Khalil's motion would translate into delays for other litigants awaiting trial; (5) given Mr. Khalil's poor health, the court would be ill-advised to delay Mr. Khalil's case pending resolution of the other cases; and (6) there was no real threat of bias or prejudice, even though the court had presided over related criminal and civil cases. *See BCCI Holdings (Luxembourg), Societe Anonyme v. Khalil,* Civ. Act. No. 95–1252, Mem. Op. (D.D.C. Oct. 8, 1998) ("Mem. Op."), *reprinted in* Joint Appendix ("J.A.") 277.

The issues on the merits raised by Mr. Khalil focus on the District Court's award of damages and the underlying findings of causation. The District Court generally agreed with the liquidators that Mr. Khalil was liable for receiving money for his participation in the various nominee schemes, though the trial court did not accept all of the liquidator's claims. In particular, the court found that Mr. Khalil was liable for $27,500,000 that he received as direct payments from BCCI for his participation in the nominee schemes, $15,249,283 that BCCI paid for Mr. Khalil's expenses, $47,069,808 that BCCI paid to Mr. Khalil's companies, an additional $236,562,250 that BCCI sent to Capcom, and $62,021,193 that represented the losses that BCCI suffered from silver and copper trading that involved and was facilitated by accounts in Mr. Khalil's name. The final result was that the liquidators were awarded damages of $388,402,534, which were tripled to $1,165,207,602 pursuant to 18 U.S.C. § 1964(c). *See Khalil,* 56 F.Supp.2d at 66–69. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

The parties agree that the standard of review covering the District Court's denial of Mr. Khalil's Rule 39(b) motion for a jury trial is abuse of discretion. The parties also agree that the findings on the claims based on common law fraud, unjust enrichment, and conversion are reviewed under the clearly erroneous standard. The par-

ties disagree, however, over the standard of review covering the findings of proximate cause under RICO.

■ On this last point, we find the Supreme Court's decision in *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840–41, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996), to be persuasive. In *Sofec,* the Court explained that "[t]he issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review." *Id.* Mr. Khalil argues that *Sofec* is inapposite, because the standard enunciated there is limited to admiralty cases. There is nothing in the Court's opinion, however, that so narrows its applicability. It seems clear here, just as in *Sofec,* that findings on proximate causation involve mixed questions of law and fact subject to limited review. In any event, even if we were to engage in *de novo* review, as Mr. Khalil suggests, our judgments on the matters in issue would not change.

### B. The Jury Issue

Mr. Khalil's jury-demand argument is specious. Mr. Khalil did not file a jury demand either when the liquidators filed their complaint on July 3, 1995 or when he filed his answer to the complaint on February 10, 1997. It took almost three years from the filing of the complaint and more than a year after the filing of the answer for Mr. Khalil to bring it to the District Court's attention that he wanted a jury trial. By then, the trial court had scheduled the case for a bench trial, discovery had been extended and closed, and the deadline for motions had already passed.

Federal Rule of Civil Procedure 38 is clear that a party waives his right to a trial by jury if he does not "(1) serv[e] upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue, and (2) fil[e] the demand as required by Rule 5(d)." FED. R. CIV. P. 38. A party who fails to make a timely request

for a jury trial may avoid waiver and secure a jury trial only if the District Court *"in its discretion"* acts favorably on such a request. FED. R. CIV. P. 39(b).

■ Under Rule 39, a trial court may abuse its discretion in denying a late request for a jury trial. This does not mean, however, that a trial court must indulge a presumption in favor of the neglectful party when faced with a late demand. Thus, a trial court is not required to grant a Rule 39(b) request based on nothing but inadvertence, because, "[t]hough the court might, in its discretion, have ordered a jury trial, it [is] under no obligation to do so." *May v. Melvin,* 141 F.2d 22 (D.C.Cir. 1944); *see also Wall v. National R.R. Passenger Corp.,* 718 F.2d 906, 910 (9th Cir. 1983) ("The record does not demonstrate any reason, other than counsel's inadvertence, for the failure to comply with rule 38(b). The district judge did not abuse his discretion."); *Rhodes v. Amarillo Hosp. Dist.,* 654 F.2d 1148, 1154 (5th Cir. Unit A 1981) (finding even under a presumption in favor of granting untimely jury demands that "[i]t is not an abuse of discretion by a District Judge to deny a Rule 39(b) motion ... when the failure to make a timely demand for a jury trial results from mere inadvertence on the part of the moving party"); *Paramount Pictures Corp. v. Thompson Theatres, Inc.,* 621 F.2d 1088, 1090 (10th Cir.1980) ("By failing to make a timely demand defendants waived their rights. The trial court then has the discretion, upon motion, to order trial by jury. That discretion is broad, and the court's exercise, either to grant or to deny a jury trial, is reversible only if it appears from all of the facts and circumstances that the court abused its discretion." (internal citations omitted)).

■ In this case, mere inadvertence is the only leg upon which Mr. Khalil can stand, and it is at best a very weak base. Mr. Khalil does not deny that he waived his right to a jury. Rather, he claims that despite his mistake, the burden should be

on the opposing party to present strong and compelling reasons why the late demand for a jury trial should not be granted. This is not what Rule 39 says, however. The rule merely states that, upon motion from a party like Mr. Khalil, the District Court *"may"* (not shall) *"in its discretion"* order a trial by jury. Absent an abuse of discretion by the trial court, a defaulting party who has already *waived* the right to a jury trial under Rule 38(d) has no viable claim. This does not mean that a trial court can simply ignore a Rule 39(b) motion or whimsically deny it for no good reason. But trial courts have wide latitude under the abuse of discretion standard to weigh the merits of late demands for jury trials.

■ The District Court's judgment in this case easily survives review under the abuse of discretion standard. The District Court reasonably considered the factors enunciated by the Supreme Court in *Pierce v. Underwood*, 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490. In *Pierce*, the Court noted that,

> [o]ver the years, appellate courts have consistently upheld the trial judges in allowing or refusing late-demanded jury trials, but in doing so have laid down two guidelines for exercise of the discretionary power. The products of cumulative experience, these guidelines relate to the justifiability of the tardy litigant's delay and the absence of prejudice to his adversary.

*Id.* at 562, 108 S.Ct. 2541. Following the *Pierce* Court's lead, the District Court found that Mr. Khalil's delay was not justified, because it was the product of mere inadvertence, and "where the length of time to discover the error is as long as here, where discovery is complete and the motions' deadline has passed, and where the Court and the opposing party have come to rely on a bench trial, this factor weighs against granting a trial by jury." Mem. Op. at 8, *reprinted in* J.A. 284. The trial court also reasonably found that BCCI had made a "plausible and specific enough showing of prejudice." *Id.* at 9, *reprinted in* J.A. 285. In short, we have no basis upon which to second-guess the judgment of the District Court.

## C. Proximate Causation

■ On the merits of this case, Mr. Khalil first posits that the District Court's standard of proximate cause under RICO was too lax. He argues that "a RICO claimant must prove that he was the 'intended target' of the RICO scheme and that the alleged injury was the 'preconceived purpose' of the RICO activity." Br. of Appellant at 35. In our view, appellant's argument on this point is simply wrong.

In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), which involved a civil action under RICO, the Court considered the meaning of the statutory phrase—"[a]ny person injured in his business or property by reason of a [RICO] violation"—found in 18 U.S.C. § 1964(c). The Court's discussion is illuminating:

> This language [18 U.S.C. § 1964(c)] can, of course, be read to mean that a plaintiff is injured "by reason of" a RICO violation, and therefore may recover, simply on showing that the defendant violated § 1962, the plaintiff was injured, and the defendant's violation was a "but for" cause of plaintiff's injury. This construction is hardly compelled, however, and the very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades us that RICO should not get such an expansive reading.
>
> ... Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act.
>
> ... [W]e [have] held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a "but for" cause of his injury, but was the proximate cause as well.

The reasoning applies just as readily to § 1964(c).... Proximate cause is thus required [under RICO].

*Id.* at 265–68, 112 S.Ct. 1311.

The Court in *Holmes* defined proximate cause as essentially reflecting "ideas of what justice demands, or of what is administratively possible and convenient." *Id.* at 268, 112 S.Ct. 1311. Proximate cause exists to ensure that a random third party who suffers "merely from the misfortunes visited upon [him] by the defendant's acts" does not recover. *Id.* It also ensures that courts do not get ensnared in administratively complex questions over factual causation and apportionments of damages. The Court reasoned that a proximate cause requirement would sufficiently deter injurious conduct, because "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269–70, 112 S.Ct. 1311. The Court never suggests, however, that the only or best way to prove proximate cause is for a plaintiff to prove he was the "intended target" and that the injury was the "preconceived purpose" of the RICO activity. We therefore reject appellant's highly restrictive reading of RICO.

With one exception, the record in this case offers ample evidence to support the District Court's findings that Mr. Khalil was the proximate cause of RICO injuries suffered by BCCI, as well as the District Court's findings of common law violations. The District Court's judgments on these points are well-explained in its published opinion; that opinion needs no revision, save for one point.

█ The one exception centers on the $62,021,193 in silver and copper trading losses that the District Court found were directly linked to the use of Mr. Khalil's name. Unlike the other payments, which are directly traceable to Mr. Khalil's fees for participating in the nominee scheme, the silver and copper trading losses are much more contingent on other factors. Without much other analysis, the trial court reasoned that, "[a]lthough market conditions played an important role in bringing those losses about, the use of Khalil's name remained a substantial factor causing those losses. These losses can be traced directly to the fraudulent use of Khalil-owned companies." *Khalil,* 56 F.Supp.2d at 61. The District Court and appellees seem to claim that the bank's losses would have been prevented or reduced had the bank known about the futures trading at issue. In particular, they suggest that the Board of Directors had placed limits on investments and that Khalil facilitated the avoidance of these limits by lending his name to fraudulent endeavors, thus causing the bank to suffer losses. We can find no record evidence demonstrating that this specific set of losses is directly traceable to the ability of the perpetrators to hide the losses in Mr. Khalil's name. We therefore reverse the judgment against Mr. Khalil resting on the disputed silver and copper trading losses.

### III. CONCLUSION

We reverse the judgment of the District Court resting on the silver and copper trading losses. We affirm the judgment of the District Court in favor of appellees on all other points. The case is hereby remanded to the District Court to recalculate the damages that are due to appellees.

*So ordered.*