Roy L. PEARSON, Jr., Appellant,

v.

Soo CHUNG, et al., Appellees.

No. 07–CV–872.

District of Columbia Court of Appeals.

Argued Oct. 22, 2008.
Decided Dec. 18, 2008.

---

* Judge Fisher is recused from this case.

† Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

Roy L. Pearson, Jr., pro se.

Christopher C.S. Manning for appellees.

Before KRAMER and THOMPSON, Associate Judges, and FARRELL, Associate Judge, Retired.

KRAMER, Associate Judge:

Appellant, Roy Pearson, who is an attorney, sued the Chungs, the owners of a dry cleaner called Custom Cleaners, alleging common law fraud and violations of the District of Columbia Consumer Protection Procedures Act ("CPPA"). His lawsuit was based upon signs that the Chungs displayed in their store stating "Satisfaction Guaranteed" and "Same Day Service." At the conclusion of a bench trial, Judge Judith Bartnoff, in a well-reasoned opinion, found for the Chungs on all claims. Pearson argues that the trial court misapplied the law and erred in denying his motion for a jury trial. We affirm the trial court's decision.

## I. Factual Background

Judge Bartnoff's opinion provided the following overview of this matter.

> This case has its origin in a dispute between plaintiff Roy Pearson and defendants Soo Chung, Jin Nam Chung and Ki Y. Chung over a pair of allegedly missing pants. The defendants own Custom Cleaners, a dry cleaning store on Bladensburg Road, N.E., within walking distance of the plaintiff's home. Mr. Pearson claims that he took his pants to Custom Cleaners for alterations in May 2005, that [the Chungs] lost his pants, and that they then attempted to

substitute another pair of pants for his. The defendants deny the plaintiff's allegations, and they insist that the pants they attempted to return to him—which he has refused to accept—are the pants that he brought in to be altered.

Mr. Pearson also claims that a "Satisfaction Guaranteed" sign that, until recently, was displayed in Custom Cleaners was an unconditional warranty that required [the Chungs] to honor any claim by any customer, without limitation, based on the customer's determination of whatever would make that customer "satisfied." According to the plaintiff, the defendants did not honor and had no intention of honoring that purported unconditional guarantee of satisfaction to their customers, which he contends is an unfair trade practice under the Consumer Protection Procedures Act, D.C.Code § 28–3901 *et seq.* ("CPPA").

As Judge Bartnoff noted, "based on the 'Satisfaction Guaranteed' sign and on [Pearson's] claims involving his pants ... [Pearson argued that] each of the three defendants is liable to him for seven different violations of the CPPA, for every day Custom Cleaners was open over a period of several years." Pearson also sued for common law fraud based upon the "Satisfaction Guaranteed" sign and "Same Day Service" sign.[1] By Judge Bartnoff's calculations, the damages sought could have been as much as $67 million dollars.

## A. Pearson's Evidence at Trial

The Chungs' customer relationship with Pearson began in October 1999, when Pearson began patronizing Custom Cleaners. Inside of the cleaners was a sign that read "Satisfaction Guaranteed." That sign continued to be displayed during the entire time period relevant to this case.

In July 2002, Pearson brought a pair of pants to Custom Cleaners for either cleaning or alterations (he was not able to recall which) and was waited on by Mr. and Mrs. Chung's son, Jai (who was not an owner). When Pearson went to pick up the pants, they could not be located. Jai agreed that the cleaners would compensate Pearson in the amount of $150 for the pants, which was what Pearson represented it would cost to replace them. Several days later, when Pearson returned to get the check in that amount, Jai suggested to Pearson that $80 would be more appropriate compensation since the pants were not new. When Pearson reminded him, however, that $150 was the amount agreed upon, Jai gave him a check in that amount.

Pearson testified that about a week after he received the $150 payment, he again brought some clothes to the cleaners, and Soo Chung told him that the family no longer wished to accept his business. Pearson advised her that he believed it was unlawful for Custom Cleaners to refuse to continue to do business with him in light of the "Satisfaction Guaranteed" sign if that action was taken in the aftermath of a customer complaint that had been satisfied. Otherwise, Pearson asserted, the guarantee of satisfaction was in effect a guarantee of satisfaction only once, which the merchant had a duty to disclose. Soo Chung, however, stood firm.

Several days later Pearson wrote a letter to Custom Cleaners stating that its actions constituted an unfair trade practice under the CPPA because it added a condition after-the-fact to their guarantee of satisfaction, and he asked them to reconsider their decision not to trade with him

---

1. In addition, Pearson included claims for conversion and negligence relating to the pants and sought injunctive relief and punitive damages. Those claims are not on appeal here.

anymore. Thereafter, Pearson received a phone call from a woman named Amanda Chun on behalf of the Chungs. He recalled that she asked him why he did not go to another cleaners if he was not satisfied with the work of Custom Cleaners and suggested that he should take his business elsewhere. Nonetheless, when he took some clothes into Custom Cleaners a week later, Soo Chung accepted his order without comment. Thereafter, he continued patronizing Custom Cleaners without incident until 2005.[2]

In April of 2005, Pearson accepted a position with the District of Columbia government that required him to wear a suit. Thus, before the first day of his job, which was Monday, May 2, 2005, Pearson began dropping off the pants to each of his five suits to be altered one at a time because he had gained some weight and because he was pressed for money (and, thus, could not afford to have them all altered at once). His testimony in this regard is not entirely clear, but a claim ticket in evidence dated Saturday, April 30, 2005, shows that on that date he left a pair of pants to have the waist let out. Those pants were to be ready by 5:00 p.m. on Thursday, May 5, 2005. Another claim ticket in evidence dated Tuesday, May 3, 2005, shows that on that date he left a second pair of pants at the cleaners to have the waist let out. Those pants were also to be ready by Thursday, May 5, 2005. Pearson testified that this second pair were the pants from an expensive Hickey Freeman suit with burgundy and blue pinstripes that he had purchased from Saks Fifth Avenue. At the same time he dropped off those pants, Pearson testified,

he also dropped off a pair of charcoal grey pants that were not part of a suit (and thus did not need to be altered expeditiously). When he received the claim check from Soo Chung indicating that the pants from the Hickey Freeman suit would be ready on Friday, May 6, 2005, he pointed out to her that he needed the pants on Thursday, May 5, so, as shown on the claim check admitted into evidence, Soo Chung struck through Friday and wrote in Thursday at 4:00 p.m.

Pearson testified that when he came to pick up the pants on Thursday, May 5, 2005, Soo Chung first told him that she had not "gotten around" to altering them. Then, when he asked that she simply return them to him unaltered, she told him that she had done the work and put them in a cart to be pressed; and then, when he suggested that he go to the back room of the cleaners to look for them, she said that they had mistakenly been sent to another store. Pearson testified that she assured him that the pants would be ready at 7:30 the next morning, that is, Friday, May 6, 2005.

When he returned the next morning, however, the pants still had not been located, although Soo Chung pointed out that the charcoal grey pants were ready. At that time he informed her that it would cost him at least $1000 to replace the Hickey Freeman suit. Pearson testified that upon learning this, Soo Chung immediately switched into a mode of "let me measure these grey pants," and she measured the inseam and waist of the grey pants. Ultimately, because Pearson was unable to pay for them, the grey pants

**2.** Pearson also brought to the trial court's attention that when a customer brings clothing to Custom Cleaners, the customer is given a claim ticket which is printed by a machine. The ticket has preprinted statements regarding conditions of service on the back of the ticket. Soo Chung testified that Custom Cleaners did not draft those conditions and has never used or attempted to enforce them. No testimony was presented to the contrary. Thus, we need not address that issue.

were left at the cleaners. At Soo Chung's request, he retrieved the suit coat that he said matched the pants to help her track them down, understanding that it would take several days to search their stores.

Pearson returned on May 14, 2005, having heard nothing further about his missing suit pants, and Soo Chung presented him with a pair of grey pants that Pearson testified had cuffs and "double loops" which she asserted were his. He testified that he had never in his life worn pants with cuffs, so he knew these were not his, but Soo Chung insisted that they were his pants and asserted that she remembered working on them.

Pearson testified that at that point he realized that Soo Chung was never going to replace the pants. After attempting to find out if he could get material for a new pair of pants from Hickey Freeman that would match the suit jacket and learning that he could not, Pearson concluded that "this has been going on" since 2002, and that "despite what the [Chungs] led [him] to believe about living up to the 'Satisfaction Guaranteed' sign, and because this is such a striking fraud," he should pursue relief under the District's CPPA. Indeed, Pearson concluded that Soo Chung had measured the inseam and waist on the charcoal grey pants so that she could be sure that when she gave him the grey pants with cuffs, they would be the right size (presumably so she could foist them off as his). So he drafted a demand letter, attaching provisions of the CPPA, including the provision for triple damages and had the letters delivered individually to Soo Chung, Jin Nam Chung and Ki Y. Chung.

In addition to his own testimony, Pearson called as a witness his thirty-year-old son, Jumoke Tyehimba, who owned a ca-

tering company. His son testified that from March, 2004 to February, 2005, he was employed at the Park Hyatt Hotel as the sales and catering coordinator and was required by the hotel's dress code to wear a suit, or at least a sport coat and pants. Because he was unable to afford a suit and was about the same size as his father, Tyehimba had borrowed four of his father's suits for work. After about a year, he moved to a new job with a substantial increase in salary that enabled him to buy his own suits, so in March of 2005 he returned the borrowed suits to his father. Tyehimba also testified that although he himself prefers cuffs on his pants, none of his father's suit pants had cuffs.

Pearson also called Samuel Adinew, a salesman from the men's department of Nordstrom, to testify. He had sold Hickey Freeman suits for thirteen years and recalled that Pearson had contacted him in May, 2005 to inquire whether Hickey Freeman had more of the fabric that matched his suit jacket. Mr. Adinew had checked and found that the material was no longer available.

In addition, Pearson called four witnesses to testify about their dissatisfaction with Custom Cleaners.[3] One claimed that the cleaners had damaged the lace on the sleeve of a dress, another claimed that the cleaners had lost a sweater, another claimed that it had discolored a white suit, and another claimed that it had ruined a pair of pants. In two cases, the Chungs disputed the customer's claims and the customer did nothing to follow up or pursue the claim further. The customer who complained that her sweater was missing had no claim receipt and the Chungs questioned whether the item was brought in at all. The fourth customer admitted that

---

**3.** Pearson had twenty-six such witnesses listed in his Pretrial Statement, but the trial court limited him to four, given that the testimony was essentially duplicative.

she and the man who waited on her may have misunderstood each other. Each of the four customers testified that she would expect the cleaner to pay for the value of the lost or damaged clothing if it could not be repaired.[4]

### B. The Defense Evidence

The Chungs vigorously disputed Pearson's claims. Soo Chung, who testified through an interpreter, recounted that she had emigrated to the United States from South Korea in 1992. Her husband had learned the dry cleaning business while they lived in Korea from Soo Chung's younger brother, who had a dry cleaning business. When the Chungs came to the United States, they opened two cleaners (Happy Cleaners and Fabric Care) that were simply "pickup stores" without dry cleaning machines on the premises. Some years later, they opened Custom Cleaners, which had the cleaning equipment on the premises. Soo Chung testified that her job at Custom Cleaners is to staff the counter and to do alterations, as well as miscellaneous matters such as bagging the clothes after they are cleaned.

Although Custom Cleaners at one point had a sign on the wall that read, "Satisfaction Guaranteed," Soo Chung testified that the sign had been removed by the time of trial in order to avoid further litigation. She also testified that her understanding of the sign was that the cleaners "would do whatever we can in our capacity within our cleaners" to fix a customer's problem. For example, she testified, "if we are talking

about alterations then we will provide the alteration to fix or to resolve the situation," or "if the dry cleaning has not been done in a clean fashion ... we will dry clean the clothes again," that is, "whatever we can we will do to resolve the problem." If the problem cannot be resolved, then, she testified, "We will compensate [ ] the customer for the value of their clothing."[5] Soo Chung also testified that Pearson was the only person who had ever complained about the "Satisfaction Guaranteed" sign or suggested that it was misleading in any way.

Soo Chung testified that she specifically recalled that on May 3, 2005, Pearson brought in two pairs of pants for alterations. One had cuffs and the other had "three belt inserts" (elastic waist inserts used to expand the size of the waistband), which, she noted, "is rather unusual." When shown a pair of pants in court, Soo Chung testified that, because of the unusual belt inserts, she recognized the pants as the ones that Pearson had told her he wanted altered first. Moreover, she testified that the number on the red ticket attached to those pants (# 182) was the same as the number on the red tag attached to the claim ticket. Soo Chung had no doubt that the pants she attempted to return to Pearson were the pants he had brought in for alterations on May 3. She testified that after she had finished the alterations on those pants, they had been mistakenly delivered to another store. Thus, she had suggested that Pearson re-

---

4. One customer first testified that she would have been satisfied had she been compensated $198, the value of her suit, but later asserted that she should have received $500 because of "inconvenience."

5. Pearson argues that this was not how the cleaners operated, and that "the defendants admitted in sworn answers to interrogatories that they imposed a host of material pre-

conditions on their advertised guarantee of satisfaction." In fact, however, the interrogatory answers that Pearson points to merely state that Custom Cleaners abides by industry standards relating to disputes with customers. Pearson points to no evidence that industry standards are inconsistent with the policy that Soo Chung described.

turn on May 7, 2005, to give them adequate time to locate the pants.

On May 7, 2005, when he returned to pick up his altered pants, Pearson said the pants that Soo Chung had were not his. Although she tried to assure him that the pants were indeed the ones that he had brought for alteration, he continued to assert that they were not his pants. Thus, Soo Chung—through her friend Mrs. Parks, whose English is more fluent—suggested that Pearson bring in the jacket from the suit that matched the pants. Because Pearson had the other pair of charcoal grey pants at the cleaners too, Soo Chung was able to compare the measurements of the two pairs of pants. The comparison—in addition to the unusual belt loops and the fact that she had actually been the person who altered the pants—convinced Soo Chung that these were indeed his pants.

Two other customers from the area—Saymendy Lloyd, a social worker and community activist, and Robert King, an Advisory Neighborhood Commissioner—testified that the Chungs had provided "very good service" and have contributed to their community. Both also testified that they understood the "Satisfaction Guaranteed" sign to mean that the Chungs would do their best to correct a mistake if an error was made and if they could not, would pay for the item that was damaged.

## II. Common Law Fraud and CPPA Claims Regarding "Satisfaction Guaranteed" Sign

 Pearson contends that the trial court erred by rejecting his claim that the "Satisfaction Guaranteed" sign constituted common law fraud and a violation of various provisions of the CPPA, specifically D.C.Code § 28–3904(a), (d), (e), (f), (h), and (u).[6] To prevail on a common law fraud claim, a plaintiff must establish by clear and convincing evidence that there was "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation...." *Park v. Sandwich Chef, Inc.*, 651 A.2d 798, 801 (D.C.1994) (citation omitted). *See also Lumpkins v. CSL Locksmith, LLC*, 911 A.2d 418, 424 (D.C.2006). Violations of the CPPA must also be proven by clear and convincing evidence. *See Caulfield v. Stark*, 893 A.2d 970, 976 (D.C.2006) ("the clear and convincing evidence standard applies to claims of intentional misrepresentation under the CPPA" (quoting *Osbourne v. Capital City Mortgage Corp.*, 727 A.2d 322, 326 (D.C.1999))).[7] Pearson's

6. Those provisions of the CPPA read that

> [i]t shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:
> (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;
> ....
> (d) represent that goods or services are of particular standard, quality, grade, style, or model, *if* in fact they are of another;
> (e) misrepresent as to a material fact which has a tendency to mislead;

> (f) fail to state a material fact if such failure tends to mislead;
> ....
> (h) advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered;
> ....
> (u) represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

7. As did Judge Bartnoff, we reject Pearson's argument that *Osbourne* was overruled by the 2000 Amendments to the CPPA, based on a provision that was added to § 28–3901 that the statute is to "be construed and applied

argument is that the Chungs' guarantee of customer satisfaction constituted common law fraud and violated the cited provisions of the CPPA since they did not live up to that promise.

■ Pearson's claims regarding the "Satisfaction Guaranteed" sign are premised on his interpretation that the sign is an unconditional and unlimited warranty of satisfaction to the customer as determined solely by the customer, without regard to the facts or to any notion of reasonableness—a position he has consistently advocated both in the trial court and on appeal. In his opening brief, for example, Pearson challenged the trial court's rejection of his position that "Satisfaction Guaranteed" is an "affirmative representation of *unconditional* customer-determined satisfaction," and argues unambiguously that "[a]s a consequence of offering an unconditional guarantee of satisfaction a merchant is required to satisfy a consumer's demand for lawful compensation (for example, *for any amount of money* )." (emphasis added). Indeed, in his trial testimony, he confirmed that in his view, if a customer brings in an item of clothing to be dry cleaned, and the dry cleaner remembers the item, and the customer then claims that the item is not his when the dry cleaner presents it back to the customer after it has been cleaned, the dry cleaner must pay the customer whatever the customer claims the item is worth if there is a "Satisfaction Guaranteed" sign in the store, even if the dry cleaner knows the customer is mistaken or lying.[8]

In fact, every Custom Cleaners customer who testified, other than Pearson, testified that if Custom Cleaners lost or damaged an item of clothing, Custom Cleaners should reimburse them only for the value of the clothing. This interpretation coincides with the interpretation of the "Satisfaction Guaranteed" sign given by Soo Chung. As the trial court found, a reasonable interpretation of the "Satisfaction Guaranteed" sign is

that if there is a problem with drycleaning, laundry or alterations, the cleaner should try to fix it, and if the problem cannot be fixed, the cleaner should make reasonable compensation to the customer for the value of the damaged item. The Court does not find that the evidence presented by the plaintiff in any way establishes that the defendants had no intention of honoring that guarantee. To the contrary, the evidence presented by Mr. Pearson regarding his experience in 2002 demonstrates that they did. When a pair of his pants could not be located at that time, Custom Cleaners compensated Mr. Pearson fully for the value of the pants.

Thus, the trial court, showing basic common sense, rejected this unlimited view of a "Satisfaction Guaranteed" sign, relying instead upon case law generally supporting the position that, as with a common law fraud claim, a claim of an unfair trade practice is properly considered in terms of how the practice would be viewed and understood by a reasonable consumer. That position has ample support. *See Campbell Music Co. v. Singer,* 97 A.2d 340, 341–42 (D.C.1953) (holding that although a television set had been guaranteed to the "personal satisfaction" of the purchaser at the time of purchase, the customer could not return the television

liberally to promote its purpose." D.C.Code § 28–3901(c) (2001).

8. At oral argument, Pearson acknowledged that there may be some limitations on this guarantee in some situations, but he nonetheless continued to endorse his interpretation of the "Satisfaction Guaranteed" sign with respect to this case.

for a refund over fifteen months after it was purchased); *Rossman v. Fleet Bank Nat'l Ass'n*, 280 F.3d 384, 394 (3d Cir. 2002) (in a Truth in Lending Act case, holding that the meaning of "no annual fee" advertisement was based on the understanding of "a reasonable consumer"); *Alicke v. MCI Commc'ns Corp.*, 324 U.S.App. D.C. 150, 153, 111 F.3d 909, 912 (1997) (rejecting customer's claim that MCI committed fraud by reporting long-distance telephone calls in full-minute increments on bills because "no reasonable customer could actually believe that each and every phone call she made terminated at the end of a full minute, [and thus] MCI's billing practices could not mislead a reasonable customer."); *Uebelacker v. Paula Allen Holdings, Inc.*, 464 F.Supp.2d 791, 805–06 (W.D.Wisc.2006) (phrase "quality satisfaction guaranteed," which appeared in a description of a business, "is a classic example of commercial 'puffery' on which no reasonable person would rely," citing *Tietsworth v. Harley–Davidson, Inc.*, 270 Wis.2d 146, 677 N.W.2d 233, 245 (2004), which defined puffery as "the exaggerations reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined").

Pearson, on the other hand, cites no pertinent authority [9] that supports his interpretation of "Satisfaction Guaranteed." Because we agree with the trial court that Pearson's expansive interpretation of "Satisfaction Guaranteed" is not supported by law or reason, we affirm the trial court's conclusion that Pearson failed to establish that the Chungs' "Satisfaction Guaranteed" sign constituted common law fraud or violated the CPPA.

Moreover, the factual findings support that Custom Cleaners acted in accordance with its own policy. In 2002, when Custom Cleaners lost Pearson's pants, it reimbursed him for the full replacement value of the pants as reported by him. As for the pants allegedly lost in 2005, the trial court found Soo Chung to be highly credible and declined to accept Pearson's testimony that the pants he brought in were not the pants that Soo Chung returned to him, finding instead that the evidence was in equipoise. Because Pearson failed to meet the standard of proving either his common law fraud claim or any of his CPPA claims by clear and convincing evidence,[10] we affirm the trial court's decision awarding judgment to the Chungs on those claims.

In the end, whether Pearson's claims are considered under a common law fraud claim or under the CPPA makes no difference because he was unable to establish the underlying factual basis for relief. Finding Soo Chung to be "very credible," the trial court wrote:

> The Court agrees with the plaintiff that the pants in the defendant's possession do not appear to match the jacket to this burgundy and blue pinstriped suit. The Court will also accept that Mr. Pearson does not like cuffs on his pants. The plaintiff may well believe that he brought the pants to his burgundy and blue pinstriped suit to the defendants,

---

**9.** Pearson cites to 16 C.F.R. § 239.3(a) (2008), which requires a seller or manufacturer to refund the full purchase price of an "advertised product" at the purchaser's request. That regulation is not applicable here, since the cleaners were providing a service, not selling a product.

**10.** "Clear and convincing evidence" is defined as "the evidentiary standard that lies somewhere between a preponderance of evidence and evidence probative beyond a reasonable doubt." *In re A.B.*, 955 A.2d 161, 166 (D.C.2008) (citation omitted). Thus, evidence in equipoise falls far short of the standard that Pearson was required to meet to prevail.

but there also is strong evidence that he did not. The Court found Soo Chung to be very credible and her explanation that she recognized the disputed pants as belonging to Mr. Pearson because of the unusual belt inserts was much more credible than his speculation that she took a pair of unclaimed pants from the back of the store and altered them to match his measurements. Mr. Pearson only recently had received four suits back from his son, he brought in several pairs of pants over a period of less than two weeks for alterations, and it certainly is plausible that the pants on the hanger with his blue and burgundy pinstriped suit jacket were not the pants that matched the jacket, even if Mr. Pearson assumed that they were.

In summary, noting that claims of common law fraud, as well as violations of the CPPA, must be proven by clear and convincing evidence, Judge Bartnoff concluded that "the plaintiff has not met his burden of proving that the pants the defendant attempted to return to him were not the pants he brought in for alterations." Without such proof, all of his claims pertaining to those pants must be denied, and we affirm Judge Bartnoff's decision to do so.

### III. CPPA Claim Regarding "Same Day Service" Sign

 Pearson also argues that the "Same Day Service" sign violated various provisions of the CPPA, specifically D.C.Code § 28–3904(a), (d), (e), (f), and (h) (2001). But as the trial court found, Pearson presented no evidence that same day service

was not provided by Custom Cleaners.[11] Instead, Pearson's argument is based on a presumption that the "Same Day Service" sign was a false statement unless "Same Day Service" was always and automatically provided. Pearson, however, offers no support for this interpretation of the "Same Day Service" sign, which frankly defies logic. If a person brings an item in for dry cleaning five minutes before the store closes, same day service could not reasonably be expected.[12] Moreover, while Pearson testified that the claims ticket automatically provided a pickup date three days after the item was dropped off, he conceded that an earlier pickup date would be provided if requested. Pearson points to no evidence that Custom Cleaners did not make same day service available. Accordingly, this claim must also be denied, and we affirm Judge Bartnoff's decision to do so.

### IV. Denial of a Late-filed Motion for a Jury Trial

 Finally, Pearson argues that the trial court erred by denying his late-filed motion for a jury trial. The Chungs, on the other hand, argue that Pearson erred procedurally in his effort to appeal the trial court's orders denying his motions for trial by jury because he did not specifically make reference to those orders in his notice of appeal. Pearson's notice of appeal stated that he was appealing "the Order of June 25, 2007, and orders merged therein." Because "an appeal of a final judgment draws into question all prior non-final rulings and orders," Pearson's appeal of the trial court's orders denying his motions for

---

11. Indeed, Pearson testified that he has never requested same day service. The question of whether he has standing to raise this claim has not been addressed by the parties, and we decline to address that question.

12. Pearson testified that he was "in that store once before when someone came in and asked for same day service and [Soo Chung] said that it was too late, their pressers had gone for the day. . . ." At oral argument, Pearson noted that same day service was not available between 4:00 p.m. and 7:00 p.m.

trial by jury was proper. *Flax v. Schertler*, 935 A.2d 1091, 1099 (D.C.2007) (citations omitted).

■ Super. Ct. Civ. R. 38 entitles a party to a trial by jury "of any issue triable of right by a jury" only if the demand is made "not later than 10 days after the service of the last pleading...." Pearson concedes that he did not make a demand for a jury trial in Superior Court within the required time period. Nonetheless, Super. Ct. Civ. R. 39(b) provides that "notwithstanding the failure of a party to demand a jury in an action in which such demand might have been made of right, the Court in its discretion upon motion may order a trial by a jury of any or all issues." Factors to be considered by the court include "all elements pertinent to the interests of both parties and also to the general conduct of the business of the court," such as "the possibility of prejudice to other parties and the likelihood of delay attendant upon a sudden switch from a non-jury to a jury trial." *Dominique v. Ralph D. Kaiser Co.*, 479 A.2d 319, 322 (D.C.1984) (citation omitted).

■ Pearson asserts that the trial court, in ruling on his motion for a jury trial, abused its discretion by failing to consider four of the five factors that *Kass v. Baskin*, 82 U.S.App. D.C. 385, 164 F.2d 513 (1947), "requires a court to consider" when deciding a motion for trial by jury filed after the time frame in which a jury trial is of right. Pearson, however, misreads *Kass*. It does not require a trial court to consider any particular factors, but instead states that "the court may consider and act upon any and all pertinent factors in the case, including particularly the nature of the issues presented by the pleadings and the general orderly disposition of the court's business." 82 U.S.App. D.C. at 387, 164 F.2d at 515. Thus, a trial court has the discretion to consider relevant factors and to rule appropriately. *See also May v. Melvin*, 78 U.S.App. D.C. 368, 368, 141 F.2d 22, 22 (1944) (under Federal Rules of Civil Procedure, if a party fails to request a jury trial within ten days after service of the last pleading, the court has discretion to order a jury trial, but has no obligation to do so).

Pearson cites *Hiotis v. Sherman Distributors of Maryland, Inc.*, 607 F.Supp. 217 (D.D.C.1984) for the proposition that "[i]t is well established that a [trial] court should grant a Rule 39(b) motion in the absence of strong and compelling reasons to the contrary," and that such a motion "should be favorably considered unless there are persuasive reasons to deny it." *Id.* at 219 (citations and internal quotation marks omitted). This language, however, was effectively overruled by *BCCI Holdings (Lux.), S.A. v. Khalil*, 341 U.S.App. D.C. 408, 214 F.3d 168 (2000), which rejected the *Hiotis* interpretation of Rule 39(b) and stated that

> [a]bsent an abuse of discretion by the trial court, a defaulting party who has already *waived* the right to a jury trial under Rule 38(d) has no viable claim. This does not mean that a trial court can simply ignore a Rule 39(b) motion or whimsically deny it for no good reason. But trial courts have wide latitude under the abuse of discretion standard to weigh the merits of late demands for jury trials.

341 U.S.App.D.C. at 413, 214 F.3d at 173.

■ Pearson's Rule 39(b) motion seeking a jury trial was purportedly based upon his perception that Judge Kravitz, who was the judge assigned to the case at the time of the scheduling conference, had already formed a view of the case adverse to Pearson's position. He based this on his recollection that Judge Kravitz, at the scheduling conference, had "voiced the

firm view that the case should not be litigated." The transcript of the scheduling conference—available to Judge Kravitz before he ruled on the motion—does not support Pearson's recollection. On the contrary, the transcript reflects that the parties themselves had agreed before they came before Judge Kravitz that the case should be put on a speedy time schedule (known as Track #1) in order to expedite it, and that the closest that Judge Kravitz came to saying anything that could possibly constitute belittling the merits of the case was when he pointed out that the claim was "not a complicated issue." Indeed, Pearson himself said to Judge Kravitz:

> [W]e spent a great deal of time discussing settlement. We've agreed to track one in an effort to expedite the case. I'm open to mediation at any time, but we've spent a great deal of time discussing the prospects and there doesn't seem to appear to be any there.

Judge Kravitz, following Pearson's suggestion, inquired whether mediation should take place "right away before discovery goes any further and the parties spend more time and money and energy on it."

In rejecting Pearson's late-filed motion for a jury trial, Judge Kravitz noted that "[t]he plaintiff premises his motion upon two accusations of judicial misconduct." The court explained that Pearson's accusations were without merit, recognized that it had discretion to grant the motion, and agreed with Pearson

> that, as a general matter, such motions should be considered liberally. However, where, as here, the only bases upon which a party has relied in seeking the Court's leave are entirely refuted by the record and by the governing law, the Court does not believe that it should

exercise its discretion in favor of that party.

Pearson's renewed motion for trial by jury essentially restated his original motion, and was also denied.

Pearson has not established that the trial court abused its discretion in denying his motions for trial by jury. The trial court had discretion to grant or deny Pearson's Rule 39(b) motion, recognized that it had such discretion, purported to exercise it, and supported its determination with sufficient facts. *See Johnson v. United States,* 398 A.2d 354, 363–64 (D.C.1979). There has been no showing that the trial court "failed to consider a relevant factor ... [or] relied upon an improper factor," and "the reasons given reasonably support the conclusion." *Id.* at 365 (citation omitted). A trial court has discretion in deciding a Rule 39(b) motion and there was no abuse of discretion here. In any event, he cannot possibly show prejudice, since the case was ultimately tried by Judge Bartnoff, not Judge Kravitz. Therefore, we affirm Judge Kravitz's decision on this point.

## V. Conclusion

Appellant failed to establish either that the Chungs' "Satisfaction Guaranteed" and "Same Day Service" signs constituted false or misleading statements, or that they lost his pants. Thus, the judgment for the Chungs on the fraud and CPPA claims was proper. Further, the trial court did not abuse its discretion in denying appellant's motions for a jury trial.

Accordingly, the trial court's judgment is

*Affirmed.*