*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-BG-586

IN RE ROY L. PEARSON, JR., RESPONDENT

A Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 955948)

On Report and Recommendation
of the Board on Professional Responsibility
(15-BD-31)

(Argued January 9, 2020                                    Decided June 4, 2020)

*Roy L. Pearson*, *Jr*., pro se.

*Joseph Charles Perry*, Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, and *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before FISHER and EASTERLY, *Associate Judges*, and STEADMAN, *Senior Judge*.

PER CURIAM: The Board on Professional Responsibility (the "Board") concluded that the respondent, Roy L. Pearson, Jr., violated two of the District of Columbia Rules of Professional Conduct: Rule 3.1 and Rule 8.4(d).[1] Though the

---

[1] Disciplinary Counsel also charged Pearson with violating Rule 3.2(a) (delaying a proceeding "solely to harass or maliciously injure another"). However,

(continued…)

Ad Hoc Hearing Committee (the "Hearing Committee") recommended a thirty-day suspension, stayed during a two-year period of probation, the Board disagreed and recommended a ninety-day suspension without a stay. We agree with the Board's conclusion that Pearson violated both rules and adopt the Board's recommendation as to sanction.

## I.    Factual Background

The allegations of misconduct arise from the litigation culminating in *Pearson v. Chung*, 961 A.2d 1067 (D.C. 2008).[2]  In that case, Pearson sued three defendants (Soo Chung, Jin Nam Chung, and Ki Y. Chung) who jointly owned and operated Custom Cleaners, a dry cleaning business. *Id.* at 1069.  The dispute originated with Pearson's allegation that the Chungs lost a pair of pants that he had brought to Custom Cleaners for alterations. Pearson initially demanded $1,150 in

(…continued)
the Hearing Committee found that Disciplinary Counsel had not proven a violation of that rule, and the Board endorsed that finding. Disciplinary Counsel did not take exception to this finding, so the issue is not before us.

[2]   Respondent has disputed the Hearing Committee's and the Board's understanding of the operative facts throughout his brief. As the Board adopted the Hearing Committee's factual findings, and they are supported by substantial evidence in the record, we accept them. Much of our discussion of the facts is based upon the Hearing Committee's report. That report, in turn, often relied upon the record of the litigation in the Superior Court and this court.

compensation. He then filed a lawsuit in the Superior Court claiming that defendants had violated the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901 to -3913 (2013 Repl. & 2019 Supp.) ("CPPA"), and committed common law fraud, negligence, and/or conversion. Pearson's claims rested on his interpretation of three signs in the Chungs' store: "Satisfaction Guaranteed," "Same Day Service," and "All Work Done on Premises." In the initial complaint, he sought at least $15,000 in compensation for emotional distress and $15,000 in punitive damages from each defendant.

Pearson's demands for compensation escalated dramatically as the case went on. His claims for emotional damages increased to $3,000,000 by trial. He asserted that he was entitled to $90,000 to obtain a rental car so he could travel to a different dry cleaner in the city. He claimed that he had expended 1,200 hours of work on the matter, worth $500,000 in attorney's fees. He sought prospective relief requiring the Chungs to pay him $10,000 within twenty-four business hours if he notified them that they were not providing him with acceptable service.[3] His damages theories often included multiplying his claims by three (for each defendant), by two (for his separate statutory and common law claims), by three

---

[3] We note that, by trial, the Chungs did not even have the "Satisfaction Guaranteed" sign on display. *Pearson v. Chung*, 961 A.2d at 1073.

(for treble damages under the CPPA), by three (for each sign), by seven (for each CPPA subsection allegedly violated), and/or by every single day that a particular sign had been on display within the statute of limitations (under his theory that each day represented a separate violation of the statute and was independently compensable). By the time the Joint Pre-Trial Statement was filed, Pearson claimed that he was owed more than $67,000,000 in compensatory and punitive damages.

Pearson's theories of liability likewise expanded — or at least were clarified as being extremely expansive — as the litigation progressed. In his motion for partial summary judgment, Pearson claimed that the "Satisfaction Guaranteed" sign represented "an <u>unconditional</u> and <u>unlimited</u> guarantee of satisfaction, as a matter of law" (emphasis in original) so that any customer who claimed dissatisfaction, regardless of whether the claim was made in good faith, could demand any compensation whatsoever. Custom Cleaners would then have to meet that demand, no matter what it was, in order to resolve the customer's dissatisfaction. Pearson testified at trial that this would include situations in which the Chungs — or any other provider — knew that the customer was lying and/or when the customer demanded an exorbitant amount of money, such as a trillion dollars. Respondent's theories regarding the other two signs were similarly

expansive. For example, in his trial brief, Pearson listed as an "undisputed fact" that the "Same Day Service" sign meant that "*any* customer request for *any* of defendants' service would be completed the same day" (emphasis in original). The trial court granted judgment for the Chungs on this claim as a matter of law because Pearson's "Same Day Service" theory was "completely unreasonable," failing to consider any other factors, such as when customers dropped off the clothes, how many items they wanted serviced, what kind of services they were requesting, and whether customers asked for or even desired same day service.

As the case progressed, the trial court repeatedly expressed concerns about Pearson's characterizations of case law, statutes, and the court's own orders. In one instance, the court pointed out that Pearson had misquoted a case, attempting to imply that it had involved an identical "Satisfaction Guaranteed" sign. The court reminded Pearson that he had "an obligation to the Court to be accurate in the representations you make with regard to what cases are about." Pearson initially conceded that he had misquoted the case and apologized, but later filed a "Correction," attempting to rescind that admission, because he claimed that there was no "rational basis for distinguishing the meaning of the term 'unconditional guarantee' from the meaning of the term 'satisfaction guaranteed' . . . . In

plaintiff's view, . . . the two terms are indistinguishable in substance and meaning."[4]

At another point, the trial court quoted from a prior discovery order to rebut Pearson's contention that the discovery deadline had been implicitly extended. Pearson also made repeated accusations of bias against Judge Neal Kravitz in a pair of belated motions for a jury trial.[5]  Judge Kravitz denied the motions as being based on repetitive, "false and wholly unsubstantiated" factual claims.

Throughout litigation, Pearson cited 16 C.F.R. § 239.3(b) for his proposition that "[t]he inherently deceptive nature of an *un*qualified guarantee that turns out to be qualified is well chronicled in the law" (emphasis in brief) and to support his favored interpretation of the sign — that the sign provided an unqualified guarantee, entitling the customer, in his sole discretion, to determine whatever compensation would subjectively satisfy him.  However, Pearson consistently

---

[4]  The case in question, *Montgomery Ward & Co. v. F.T.C.*, 379 F.2d 666 (7th Cir. 1967), involved specific warranties touted in newspaper advertisements that differed from the written guarantee certificates actually provided with the advertised products.  The certificates imposed additional restrictions on the warranties. *Id.* at 670.  The case did not involve a "Satisfaction Guaranteed" sign.

[5]  Judge Kravitz handled pretrial motions, but Judge Judith Bartnoff presided over the trial.

refused to acknowledge the preceding sentence in 16 C.F.R. § 239.3(a), which stated that "[a] seller or manufacturer should use the terms 'Satisfaction Guarantee' . . . or similar representations in advertising only if the seller or manufacturer, as the case may be, refunds the full purchase price of the advertised product at the purchaser's request," directly supporting the Chungs' legal position.

Summing up Pearson's approach to litigation, the trial court observed that this was "a case that, in the Court's view, has been delayed unnecessarily by plaintiff's disproportionate approach to the discovery process and by the plaintiff's active but largely unsuccessful motions practice" and "the Court has significant concerns that the plaintiff is acting in bad faith and with an intent to delay the proceedings." In adopting the Hearing Committee's factual findings, the Board agreed that Pearson's litigation choices made the case unduly time and resource-intensive, especially considering that the suit arose from a claim that the cleaners had lost a pair of pants. Exemplifying his "voluminous and at times excessive" discovery and motions practice,[6] Pearson violated a court order prohibiting more discovery, submitted document requests that the trial court found to be "too

---

[6] Although the Board found Pearson's discovery and motions practice relevant to whether Pearson interfered with the administration of justice in violation of Rule 8.4(d), the Board also found that Disciplinary Counsel had not established that the practices constituted a violation of Rule 3.2(a).

intrusive, time-consuming, and harassing to be enforced," and then followed those requests with another set of requests that was "even more burdensome, intrusive and calculated to harass." The Board summarized these issues by stating that the Chungs were "forced to endure a major litigation that more properly belonged in Small Claims court."

The Board found that Pearson's litigation strategy and exorbitant demands had a direct impact on the amount of resources expended by both the judicial system and by defendants. During litigation, the Chungs made three offers of judgment, the largest being in the amount of $12,000, all of which Pearson rejected. At another point, after the trial had concluded in the Chungs' favor, the defendants withdrew a motion that could have allowed them to recover attorney's fees and costs, along with the imposition of Rule 11 sanctions, because the publicity generated by the case had allowed them to crowd-source the money necessary to pay their legal fees. They did so, hoping that Pearson would "put this matter behind them." Instead, Pearson argued that he should be awarded expenses and attorney's fees for opposing the motion. The court responded by observing that:

> The merits of the [Chungs'] motions are not directly before the Court, except by way of the plaintiff's request for attorney's fees or expenses. The Court recognizes that the Consumer Protection Procedures Act was

enacted to benefit consumers and that an award of attorneys' fees against a consumer plaintiff would be very unusual. But this is an unusual case, in which the plaintiff attempted to take what was at best a misunderstanding about one pair of pants and expand it to a claim of $67 million, based on legal theories that — once they clearly were articulated — were unsupported in fact or in law.

At that point, Pearson appealed to this court, *see* 961 A.2d 1067, and continued to pursue his legal theories after losing that appeal, filing a Petition for Rehearing or Rehearing En Banc.

In addition to reviewing the respondent's conduct in the *Pearson v. Chung* litigation, the Board also noted that Pearson had shown no remorse throughout the disciplinary process, but had instead chosen to litigate the charges with the very same tactics that had brought him to the disciplinary system in the first place. The Board considered this conduct only when analyzing aggravating and mitigating factors to determine what sanction to recommend; it played no role in the Board's consideration of whether Pearson had violated the Rules of Professional Conduct.

The Board found that, instead of grappling with the allegations against him — or the opinions of the trial court and this court — Pearson had continued to push the same legal theories as not only permissible, but "unambiguous, obvious, deriving from plain meaning, based on plain English, subject to no debate, and

well-established" (internal quotation marks omitted). The Board also found that Pearson "continued to engage in frivolous motions practice" before the Hearing Committee and the Board and noted that Pearson went so far as to accuse Disciplinary Counsel "of engaging in the very same types of misconduct that are the bases for the charges against Respondent."[7] Because of these aggravating factors and the overall seriousness of the misconduct, the Board rejected the Hearing Committee's recommendation of a thirty-day suspension, stayed during a two-year period of probation, and instead recommended a ninety-day suspension without a stay.

## II.    Standard of Review

Disciplinary Counsel must establish a rule violation by clear and convincing evidence. *In re Tun*, 195 A.3d 65, 72 (D.C. 2018). This court accepts the Board's factual findings "if they are supported by substantial evidence in the record." *In re Howes*, 52 A.3d 1, 12 (D.C. 2012); *see also* D.C. Bar R. XI, § 9(h)(1). We also place "great weight" on credibility determinations made by the Board and the

---

[7] Pearson has repeated these accusations in his brief to this court, describing Disciplinary Counsel's efforts as a "crude and inept" "make-up-the-violations-as-we-go-along effort to fashion something with which to literally hang the Respondent." He also refers to the Board and Hearing Committee as "proxies for racists everywhere" and calls this court's decision in *Pearson v. Chung* "moronic."

Hearing Committee because of the Hearing Committee's unique "opportunity to observe the witnesses and assess their demeanor." *In re Sabo*, 49 A.3d 1219, 1224 (D.C. 2012). As for sanctions, under D.C. Bar Rule XI, § 9(h)(1), we "shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *See also In re Cleaver-Bascombe*, 986 A.2d 1191, 1194 (D.C. 2010) ("Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed."). We review the Board's conclusions of law de novo. *In re Saint-Louis*, 147 A.3d 1135, 1147 (D.C. 2016).

### III. Analysis

### A. Rule 3.1

Rule 3.1 provides that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good-faith argument for an extension, modification, or reversal of existing law." In determining whether Rule 3.1 has been violated, "consideration should be given to the clarity or ambiguity of the

law." *In re Spikes*, 881 A.2d 1118, 1125 (D.C. 2005). The "plausibility of the position taken[] and the complexity of the issue" are also relevant factors. *Id.* Ultimately, a position "is frivolous when it is wholly lacking in substance and not based upon even a faint hope of success on the legal merits." *Id.* (internal quotation marks omitted).

Attorneys have a continuing responsibility to make an "objective appraisal of the legal merits of a position," asking how a "reasonable attorney" would evaluate "whether a claim is truly meritless or merely weak." *In re Yelverton*, 105 A.3d 413, 425 (D.C. 2014). "The distinction between a weak claim and a frivolous or meritless one can be difficult to pinpoint, and in making that determination under the ethical rules we have relied on cases applying Superior Court Civil Rule 11 and our Rule 38." *Id.* at 424.

In this case, the Board took care to explain that "[a]ttorneys in the District of Columbia should not fear discipline for making aggressive and creative arguments." It emphasized that "[f]rivolous is more than ultimately meritless, and the good faith exception to a Rule 3.1 violation allows a wide range of creative and aggressive challenges to existing law" (internal quotation marks omitted). But the Board also explained that, while a Rule 3.1 violation may not have been clear at

the outset, "[a]s his lawsuit progressed, Respondent's liability and damages arguments morphed into the preposterous." It was "the entire course of Respondent's extreme conduct over the course of the suit," not a showing "that the claims were frivolous when first made," that convinced the Board that Pearson had violated Rule 3.1.

We agree that this distinction is crucial and that, as his theories expanded and his tactics grew more extreme, respondent failed to comply with his continuing responsibility to conduct an objective evaluation of the merits of his claims. *Yelverton* proves instructive. The attorney in that case "filed numerous repetitive and unfounded motions in Superior Court and in this court, and . . . twice asked the trial judge to recuse himself from the case when he lacked any objective reason to do so." 105 A.3d at 426. The Board found that Pearson's motions and discovery practices were similarly repetitive — both during the initial litigation and during this disciplinary proceeding — and that his unfounded allegations of bias against Judge Kravitz were strikingly similar to the motion to disqualify in *Yelverton*.[8] These conclusions are well supported by the record.

---

[8] Because the quote from *Yelverton* refers to "the trial judge," we pause to make clear that Pearson's accusations of bias were directed against Judge Kravitz, who presided over pretrial motions, not against Judge Bartnoff, the trial judge.

Pearson's liability and damages claims compounded the mischief of his motions and discovery practice. Pearson protests that his liability claims cannot fairly be deemed frivolous, as he survived summary judgment and a motion to dismiss and was allowed to proceed to trial. The trial court also opted not to sanction him. But, while relevant, those decisions are not dispositive of whether the legal theories ultimately were frivolous.[9] Pearson's claims continually expanded throughout litigation and his liability and damages theories became more clear — and more outlandish — as the case progressed. As noted above, the trial court granted judgment as a matter of law rejecting Pearson's claims based on the "Same Day Service" sign. In light of the entire record, surviving summary

---

[9] Pearson brings to our attention the following quote for the proposition that surviving summary judgment is "an absolute bar" to finding a Rule 3.1 violation: "[f]or a trial judge to rule in favor of a party, the trial judge necessarily must conclude that the party's position is 'well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.'" *Montgomery v. Jimmy's Tire & Auto Ctr., Inc.*, 566 A.2d 1025, 1030 (D.C. 1989) (quoting *Indianapolis Colts v. Mayor & City Council of Baltimore,* 775 F.2d 177, 181 (7th Cir. 1985), and Fed. R. Civ. P. 11). However, similar to his selective quotation of 16 C.F.R. § 239.3(b) and other laws and cases during the *Pearson v. Chung* litigation, Pearson ignores relevant context that makes the asserted proposition untenable. *Jimmy's Tire* explicitly contemplates, in the very next sentence, that "[i]t may be that [the] denial of summary judgment . . . can be reconciled with . . . [the] finding that those papers were sanctionable" and the court remanded for an explanation of the trial court's Rule 11 finding. While the denial of summary judgment is relevant to the inquiry, *Jimmy's Tire* certainly does not stand for the proposition asserted in Pearson's brief that surviving summary judgment "is determinative" (emphasis in original).

judgment cannot be taken as a dispositive ruling that Pearson's theories had legal support. Instead, as noted by the trial court and quoted by the Board, once Pearson's legal theories "clearly were articulated," they "were unsupported in fact or in law."

It is also true that, as a technical matter, some of Pearson's theories presented a matter of first impression. But the lack of a definitive holding precluding a legal theory does not mean that it cannot be frivolous.[10] "Were this not the case, a patently frivolous but novel legal argument — 'novel,' perhaps, because no litigant would dream of bringing it with a straight face — would not be sanctionable." *Ozee v. Am. Council on Gift Annuities, Inc.*, 143 F.3d 937, 941 (5th

---

[10] Pearson points to cases such as *District of Columbia v. Fraternal Order of Police, Metro. Police-Labor Comm.*, 691 A.2d 115, 119 (D.C. 1997), as support for the position that "[w]here the applicable statute offers no clear answer and there is no case precedent contrary to the position, it cannot be said that the case has no chance of success; therefore, its assertion will not be sanctionable." As an initial matter, the Board found, and we agree, that the applicable statute and cases *did* offer a clear answer. But additionally, similar to respondent's citations to *Jimmy's Tire* discussed in note 9, above, this selective quotation does not support nearly as rigid a proposition as Pearson suggests. A close reading of *Fraternal Order* demonstrates why respondent's situation differs significantly; there, "[r]ather than ignoring the precedent most likely relevant, the District brought it to the court's attention at the outset and sought to distinguish it on a plausible basis, a factor demonstrating good faith and weighing against the imposition of sanctions." 691 A.2d at 120. Here, the Board found that Pearson had done quite the opposite, consistently combining his unbounded theories of liability with an obstinate refusal to recognize relevant portions of regulations, case law, and even the procedural history of the instant litigation.

Cir. 1998). We agree with the Board that this is one such case. The total damages figure is shocking in itself; simply put, Pearson asked the trial court to award him $67,292,000 because of his dissatisfaction with defendants' dry cleaning services. But the constituent parts of that $67,292,000 total are equally troubling. Pearson asked for $90,000 to rent a car, a facially disproportionate request in response to the alleged need to patronize another dry cleaner. He claimed that his emotional distress over a few common and innocuous signs and a lost pair of pants was so severe that he was entitled to *$3,000,000* in damages. Perhaps most remarkable was his request for a judgment obligating the Chungs to provide him with ongoing services and to pay him $10,000 immediately based on nothing more than his own request, a demand that the Hearing Committee called "patently non-cognizable," was made after the defendants had already taken down the signs at the heart of the controversy, was tethered to no statutory basis, and was completely out of proportion to any likely shortcoming in dry cleaning service. These damages theories were utterly frivolous, implausible to the point of having "not even a faint hope of success," and they violated Rule 3.1. *Spikes*, 881 A.2d at 1125 (internal quotation marks omitted).

We agree with the Board that Pearson's theories of liability also violated Rule 3.1. Under Pearson's interpretation of the signs in question, "customers"

acting in bad faith could bankrupt any business in the District with such a commonplace sign, as he acknowledged no requirement of good faith by the customer, no limitation on the demands the customer could make, and no allowances for "basic common sense." *Pearson v. Chung*, 961 A.2d at 1075. Pearson did not make the required objective inquiry into whether his liability claims had even a faint hope of success. Instead, he did the opposite, steadfastly refusing to acknowledge contrary legal authority, engaging in extensive puffery, and pressing his preferred interpretations of the signs even after they were rebuffed by his own witnesses at trial. Indeed, even in his filings in this disciplinary case, he has continued to refer to his theories as "indisputable." As the Hearing Committee noted, "Respondent has never, to this day, made the requisite objective appraisal."

Compounding the frivolousness of his liability and damages claims, Pearson regularly exaggerated or misrepresented procedural facts, case law, and statutory support for his position. As this court noted, he had "no pertinent authority" to support his interpretation of the "Satisfaction Guaranteed" sign, which was unsupported "by law or reason." 961 A.2d at 1076. The Board agreed with that conclusion and with the conclusion that Pearson's interpretation of the "Same Day Service" sign "frankly defie[d] logic." *Id*. at 1077. Simply put, by pursuing

theories of liability with no logical limit, attempting to justify those theories by misquoting and misrepresenting pertinent cases and laws, and using those theories to escalate a minor disagreement into litigation supposedly requiring 1,200 hours of his own legal research, Pearson violated his duty under Rule 3.1 to conduct a continuing objective inquiry into the merits of his positions. No reasonable attorney could have concluded that Pearson's liability and damages claims had "even a faint hope of success on the legal merits." *Spikes*, 881 A.2d at 1125 (internal quotation marks omitted).

### B. Rule 8.4(d)

Rule 8.4(d) states that "[i]t is professional misconduct for a lawyer to . . . [e]ngage in conduct that seriously interferes with the administration of justice." A violation requires improper conduct that "bear[s] directly upon the judicial process . . . with respect to an identifiable case or tribunal" and "taint[s] the judicial process in more than a *de minimis* way." *See In re Hopkins*, 677 A.2d 55, 59–61 (D.C. 1996). "[T]he purpose of Rule 8.4 is not to safeguard against harm to the client from the attorney's incompetence or failure to advocate. Rather it is to address the harm that results to the 'administration of justice' more generally."

*Yelverton*, 105 A.3d at 427. Rule 8.4(d) seeks to protect both litigants and the courts from unnecessary "legal entanglement." *Id.*

*Pearson v. Chung* provided a textbook example of unnecessary legal entanglement. Judge Bartnoff credited the Chungs' position that they never even lost Pearson's pants, stating that

> The Court found Soo Chung to be very credible, and her explanation that she recognized the disputed pants as belonging to Mr. Pearson because of the unusual belt inserts was much more credible than his speculation that she took a pair of unclaimed pants from the back of the store and altered them to match his measurements.

*Pearson v Chung*, No. 05CA4302B, 2007 WL 6965580 (D.C. Super. Ct. June 25, 2007). But even if the Chungs had lost the pants, they were still subjected to years of litigation-related stress, including excessive and invasive discovery and tens of thousands of dollars in attorney's fees,[11] due to Pearson's aggressive pursuit of an issue that the Board correctly noted "more properly belonged in Small Claims court." Frivolous actions "waste the time and resources of th[e] court, delay the

---

[11] Though the costs were eventually paid by others, as the publicity the case garnered led to multiple efforts to raise funds on their behalf, the Chungs' motion for Rule 11 sanctions included a request for almost $100,000 in attorney's fees. The fact that others volunteered to share that burden does not mitigate the conduct of Pearson that required those expenditures.

hearing of cases with merit and cause . . . unwarranted delay and added expense."

*Spikes,* 881 A.2d at 1127.

The Board found that Pearson's Rule 3.1 violations unduly burdened the judicial system. But even setting aside those violations, the Board also found that the court system was burdened by his "repetitive" motions and discovery practice, some of which was explicitly barred by a previous court order, other parts of which involved "unfounded allegations against the pre-trial judge."[12] We agree with the Board's finding that Pearson's "litigation tactics went beyond aggressiveness and crossed the boundary into abusiveness." These tactics, and this litigation, consumed far more resources than the issues merited for at least three parties: the defendants, the Superior Court, and this court. Here, as in *Yelverton,* we conclude

---

[12] Pearson claims that he did not have sufficient notice of Disciplinary Counsel's intent to fault him for his discovery practice, which he argues invalidates the finding of a Rule 8.4(d) violation. This argument fails for three reasons. First, it is clear that respondent violated Rule 8.4(d) even if we omit consideration of his discovery tactics. Second, the evidence of his discovery abuses did not constitute a new, free-standing claim, but instead merely provided additional support for the Rule 8.4(d) charge, of which Pearson had ample notice. He is entitled to notice of the charges against him, not to a complete list of every piece of evidence Disciplinary Counsel may rely upon. Third, the Specification of Charges refers to "extensive discovery and motions practice." This rather vague reference was amplified when the Hearing Committee Chair reminded Pearson that he should "be sure to give us your side of the story" regarding the need for so many discovery motions. During the hearing, Pearson himself introduced into evidence his multiple motions to compel discovery. He also had the opportunity to brief all charges after the hearing. This was sufficient notice and opportunity to be heard.

that "respondent's numerous meritless, repetitive, and at times vexatious motions and other filings, considered in their totality, caused more than *de minimis* harm to the judicial process and violated Rule 8.4(d)." 105 A.3d at 428.[13]

## IV.    Sanction

In determining the appropriate sanction, we consider factors such as "(1) the seriousness of the conduct, (2) prejudice to the client, (3) whether the conduct involved dishonesty, (4) violation of other disciplinary rules, (5) the attorney's disciplinary history, (6) whether the attorney has acknowledged his or her wrongful conduct, and (7) mitigating circumstances." *In re Martin*, 67 A.3d 1032,

---

[13] Pearson makes an additional argument, claiming that the long delay between the *Pearson v. Chung* litigation and the initiation of these disciplinary proceedings requires dismissal of all charges. It clearly is not an ideal practice to delay prosecutions for seven years, but even "troubling" and "inexcusable" delays, without more, will not "rise[] to a due process violation that warrants dismissal." *Saint-Louis*, 147 A.3d at 1148–49. Our case law states that undue delays in prosecution of disciplinary charges must be "coupled with actual prejudice" in order to justify dismissal. *Id.* at 1147 (quoting *In re Williams*, 513 A.2d 793, 796 (D.C. 1986) (per curiam)). Because *Pearson v. Chung* is a matter of public record, as are the legal arguments that Pearson made, the motions that he submitted, and the damages that he demanded, we are unable to discern any impairment of Pearson's defense that resulted from the delay. The delay, while troubling, does not rise to the level of a due process violation.

Pearson's wide-ranging brief presents numerous additional complaints. We have considered and rejected them, but see no need to extend the length of this opinion by addressing each individually.

1053 (D.C. 2013). The Board recommended a suspension of ninety days. Its primary reasons for departing from the Hearing Committee's recommendation of a thirty-day suspension with a stay were that (1) Pearson's misconduct was quite serious, as his mischaracterization of procedural facts and the facts of cases he cited compounded the problematic nature of his frivolous legal theories; (2) "Respondent's frivolous claims had [a major impact] on the resources of the Superior Court and on the Defendants"; and (3) rather than express remorse or acknowledge his misconduct, Pearson litigated this disciplinary case in the same manner that he did *Pearson v. Chung*, making outlandish claims and engaging in "frivolous motions practice." The Board stated that "Respondent's obstinacy is a significant aggravating factor" and, quoting *Yelverton*, 105 A.3d at 431, faulted him for "using the same playbook that brought him into the disciplinary proceedings." Reasoning that "[p]ast cases involving violations of Rules 3.1 and 8.4(d) have resulted in a range of sanctions, from a thirty-day suspension to an eighteen-month suspension," the Board ultimately settled on a ninety-day suspension.

We accept the Board's recommendation that a ninety-day suspension, with no stay, is "necessary to protect the public, to promote confidence in the Bar, and to deter Respondent from similar misconduct." Instead of accepting responsibility

for his actions — or even contemplating any possibility that he may have engaged in professional misconduct — Pearson has chosen at every step of the disciplinary process, including as recently as his oral argument in this appeal, to levy accusations against Disciplinary Counsel, the Board, the Hearing Committee, and this court. The ongoing nature of Pearson's conduct indicates that a ninety-day suspension is appropriate.

As we did in *Yelverton*, we find that respondent's lack of disciplinary history is a mitigating factor.[14] However, other mitigating factors cited there do not apply here. For example, unlike in *Yelverton*, we cannot say "that his actions were motivated by concern for his client." 105 A.3d at 428.

---

[14] Pearson complains that the Board referred to his *pro se* divorce litigation in Virginia when discussing his lack of disciplinary history. The Board found it "relevant" that the court ordered respondent to pay $12,000 of his former wife's attorney's fees and quoted admonitions from the Virginia trial judge that Pearson was "responsible for excessive[ly] driving up everything that went on here" and pursued disproportionate and "unnecessary litigation." Pearson has not persuaded us that it was wrong for the Board to consider this matter. In any event, excluding this evidence would not impact the outcome of this case. In light of the Board's ultimate finding that Pearson's lack of disciplinary history was still a mitigating factor, which we adopt, the reference has no bearing on our larger conclusion that the Board's sanction recommendation is within the "wide range of acceptable outcomes" that we should adopt. *Cleaver-Bascombe*, 986 A.2d at 1194.

We also share the Board's perspective on the overall seriousness of respondent's actions. We have discussed, at length, Pearson's tendency to selectively quote, or even misquote, cases, court orders, and laws. *See, e.g.*, *supra* notes 4, 9–10. We also note that, as in *Yelverton*, "[t]he sheer volume of respondent's frivolous filings" is an aggravating factor, *see* 105 A.3d at 429, because it is reflective of the larger issue of his lack of remorse and the extent of the Rule 8.4(d) violation. "It is . . . significant that respondent fails to acknowledge the wrongfulness of his conduct in persisting in the submission of meritless and unprofessional filings, both in the trial court and on appeal to this court . . . and throughout the disciplinary proceedings." *Id.*

In violating multiple rules and making unfounded allegations against various members of the judiciary and participants in the disciplinary process, respondent took actions comparable to those in *Yelverton* and *Spikes*. However, there are also some unique aggravating factors and fewer mitigating factors than there were in those cases. Spikes received a thirty-day suspension. 881 A.2d at 1119. In *Yelverton*, we imposed a thirty-day suspension but added a fitness requirement, effectively enhancing that sanction. 105 A.3d at 417. Because the Board's recommendation would not "foster a tendency toward inconsistent dispositions for

comparable conduct" and is not "otherwise . . . unwarranted," D.C. Bar Rule XI, § 9(h)(1), we adopt it and impose a ninety-day suspension.

## V. Conclusion

There is substantial evidence in the record to support the Board's factual conclusions. Even if respondent's "actions were heartfelt . . . that does not mean . . . that they were innocuous." *Yelverton*, 105 A.3d at 427. For the reasons stated above, we conclude that respondent violated District of Columbia Rules of Professional Conduct 3.1 and 8.4(d) and impose the sanction of a ninety-day suspension without a stay. Accordingly, it is ORDERED that Roy L. Pearson, Jr., is suspended from the practice of law in the District of Columbia for the period of ninety days. *See* D.C. Bar R. XI, § 14(f) ("an order of . . . suspension shall be effective thirty days after entry"). For purposes of reinstatement, the period of respondent's suspension shall not begin to run until such time as he files an affidavit in compliance with D.C. Bar R. XI, § 14(g). *See* D.C. Bar R. XI, § 16(c).

*So ordered.*