*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CV-0550

DISTRICT OF COLUMBIA, APPELLANT,

V.

FACEBOOK, INC., APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-CA-008715-B)

(Hon. Maurice A. Ross, Motions Judge)

(Argued January 30, 2025                                        Decided July 31, 2025)

*Jeremy R. Girton*, Assistant Attorney General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Graham E. Phillips*, Deputy Solicitor General, were on the briefs, for appellant.

*Joshua S. Lipshutz*, with whom *Karin Portlock*, of the bar of the State of New York, *pro hac vice*, by special leave of court, *Helgi C. Walker*, and *Katherine Moran Meeks* were on the brief, for appellee. Before the case was argued, this court granted the motion of *Katherine Moran Meeks* to withdraw as co-counsel of record.

Before MCLEESE, DEAHL, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: The District of Columbia's Consumer Protection Procedures Act (CPPA) protects consumers against false, deceptive, or unfair business practices. For much of the CPPA's history, claims under the statute had to

be based on intentional conduct. Those intentional CPPA claims often involved intentional misrepresentations akin to common-law fraud. Nearly two decades ago, we held that certain CPPA claims could be based on unintentional misrepresentations. But we left one question open: must CPPA claims based on unintentional misrepresentations be proved by clear and convincing evidence (like common-law fraud and CPPA claims based on intentional misrepresentations) or by a preponderance of the evidence? Today we hold that CPPA claims based on unintentional misrepresentations need only be proved by a preponderance of the evidence.

The CPPA claims in this case stem from the widely publicized Cambridge Analytica data leak. In 2018, the Guardian newspaper exposed that the consulting firm Cambridge Analytica had improperly purchased data that had been gleaned from tens of millions of individuals with accounts on Facebook, Inc. After the news broke, Facebook's stock value plummeted, Facebook account holders deactivated or deleted their Facebook accounts, and governmental bodies around the globe launched investigations into Facebook's conduct. The District of Columbia launched one such investigation and brought an action against Facebook for violating the CPPA.

In the District's telling, Facebook violated the CPPA by unintentionally misleading consumers about which of their data was accessible to third-party applications through a Facebook user's friends and about Facebook's enforcement capabilities for auditing third-party applications. The District also alleged that Facebook made a material omission by failing to disclose to users that their data had been obtained in violation of Facebook's policies. Facebook moved for summary judgment on the District's claims. The trial court granted summary judgment for Facebook after observing that the District had to prove its CPPA claims by clear and convincing evidence. In light of our conclusion that CPPA claims based on unintentional conduct may be proved by a preponderance of the evidence, we reverse and remand for the trial court to consider whether summary judgment is appropriate under the correct burden of proof.

Also at issue in this case is the trial court's exclusion of the District's sole expert witness, Dr. Florian Schaub. The trial court held a hearing at which it expressed criticism of Dr. Schaub's analytical methods and analysis. The court subsequently granted Facebook's motion to exclude the testimony in its entirety, referring perfunctorily to the reasons stated at the hearing and in Facebook's motion. The trial court's written order makes meaningful appellate review challenging, and, while the court's statements at the hearing provide some insight into its views on aspects of Dr. Schaub's approach, we are unable on this record to discern the specific

concerns the court had under *Motorola Inc. v. Murray*, 147 A.3d 751 (D.C. 2016) (en banc), as to some of Dr. Schaub's three methods of analysis. Accordingly, we reverse the trial court's order excluding the testimony in its entirety and remand for further analysis and explanation.

## I.    Background

We begin with a background on the CPPA, followed by a brief overview of Facebook's privacy policies leading up to the Cambridge Analytica data leak. We then describe the District's CPPA claims and the relevant procedural background.

## A.    Legal Background

The CPPA protects consumers against false, deceptive, or unfair business practices. *Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 663 (D.C. 2024). It is a broad consumer protection statute, meant to "assure that a just mechanism exists to remedy all improper trade practices." D.C. Code § 28-3901(b)(1). It "establishes an enforceable right to truthful information from merchants about consumer goods and services," and is to be "construed and applied liberally" to effectuate that purpose. D.C. Code § 28-3901(c).

Under the CPPA, people and businesses are precluded from "misrepresent[ing]" any "material fact which has a tendency to mislead." D.C. Code

§ 28-3904(e).  That prohibition extends beyond literal falsehoods and includes any omissions, "innuendo[s]," or "ambiguit[ies]" that have a tendency to mislead reasonable consumers.  *Id.* § 28-3904(f-l).  We consider an alleged violation of the CPPA "in terms of how the practice would be viewed and understood by a reasonable consumer."  *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013) (quoting *Pearson v. Chung*, 961 A.2d 1067, 1075 (D.C. 2008)). "Importantly, we have recognized that whether a trade practice is misleading under the CPPA generally is a question of fact for the jury and not a question of law for the court."  *Ctr. for Inquiry Inc. v. Walmart, Inc.*, 283 A.3d 109, 120 (D.C. 2022) (citation modified).

"With regard to the 'tendency to mislead,' a reasonable consumer generally would not deem an accurate statement to be misleading, and hence, such statement generally would not be actionable under § 28-3904(e) and (f)."  *Saucier*, 64 A.3d at 442.  But we have also recognized that prominent misleading claims are actionable even when the small print tells the truth.  *Ctr. for Inquiry*, 283 A.3d at 121 ("But, as other courts have reasoned in applying the reasonable-consumer test, 'the reasonable consumer standard does not presume, *at least as a matter of law*, that reasonable consumers will test prominent front-label claims by examining the fine print on the back label.'" (quoting *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 477 (7th Cir. 2020) (emphasis in *Ctr. for Inquiry*))).  We also have held that the placement of a

product can be an actionable misrepresentation even when the product's packaging is accurate. *Id.* at 120-21 ("[W]e do not find it facially implausible that a reasonable customer could believe, based on [a retailer's] placement of homeopathic drug products alongside FDA-approved over-the-counter drugs, that homeopathic products are comparably efficacious.").

## B. Factual and Procedural Background

### 1. Overview

Facebook is a social media platform that allows individuals to share information and connect with others online. Facebook users can display various categories of information on their profiles (such as their relationship status and religion) and can share posts and photographs on their timelines. To connect with others, Facebook users can "friend" each other. Facebook's privacy settings allowed users to pick which categories of information would be shared with whom. Generally, Facebook users could share information with three groups: the public (anyone on the internet, with or without a Facebook account), their Facebook friends, or nobody.

In 2007, Facebook launched a new category with which Facebook users could share their information: third-party applications. With the adoption of Platform,

Facebook allowed third-party applications (for example, games like Scrabble or travel apps like AirBnB) to integrate with Facebook. When third-party apps used Graph Application Programming Interface Version 1 (Graph API), the apps could access user data through a user's friends, meaning that a user did not *need* to use a certain app for that app to access her data, including up to everything that the user shared with her friends.

An example illustrates this point. Suppose a Facebook user named Jane decides to make some of her information on Facebook public (meaning that anyone online, with or without a Facebook account, can view it) while choosing to make other information available only to her Facebook friends. While Jane allows her birthday and her hometown to be public, she restricts her religion, relationship status, and photos to her Facebook friends. If Jane then accepts John's friend request on Facebook, John can see all of the information that Jane shares with her friends (her religion, relationship status, and photos). If Jane herself uses a third-party application that is linked to Facebook, the app will receive her information, just as her Facebook friend John can see her information. But with the advent of Graph API, perhaps unbeknownst to Jane, the same thing occurs when *John* uses an application—the application receives all of the information that Jane shares with John (Jane's religion, relationship status, and photos)—even if Jane has never used or even heard of the application that John uses.

This friend-sharing feature allowed applications to access exponentially more user data than they otherwise could have. Continuing with our illustrative friend John, if John has ten friends on Facebook, his decision to use a third-party application allows the application to access the data of up to eleven users (John plus his ten friends). But if John has 100 friends, or 1,000 friends, his decision to use a third-party application allows the application to access the data of hundreds or potentially thousands of Facebook users, all because John decided to use a third-party application.

In November 2013, Aleksandr Kogan launched a personality quiz application on Platform that used Graph API, meaning that it could access user data through friend sharing. Dr. Kogan informed Facebook that he was collecting user data for academic purposes and he agreed to Facebook's policies for app developers, including Facebook's policy that he would "not sell user data." Across Facebook, hundreds of thousands of users installed Dr. Kogan's personality quiz app, including users in the District. Because Graph API allowed developers to access data about a user's friends, Dr. Kogan was able to collect data on 87 million people. That included hundreds of thousands of people in the District who never themselves downloaded Dr. Kogan's application.

Dr. Kogan sold his data to Cambridge Analytica, in violation of Facebook's policies. Cambridge Analytica used the data to create political advertising on Facebook, including during the 2016 presidential election. In December 2015, the Guardian published an article revealing that Dr. Kogan may have passed data obtained through his application to Cambridge Analytica. Facebook took steps to have Cambridge Analytica delete the improperly obtained data, but those steps were ultimately ineffective.

In March 2018, news broke that Cambridge Analytica had bought individual user data from Dr. Kogan, had not deleted the data after the 2015 Guardian article and request by Facebook, and had used the data for advertising during the 2016 presidential election. *See* Matthew Rosenberg et al., *How Trump Consultants Exploited the Facebook Data of Millions*, N.Y. Times (Mar. 17, 2018). Facebook's stock value dropped, users deactivated or deleted their Facebook accounts, and governmental entities launched investigations into Facebook's conduct. In April 2018, Facebook began notifying users who were potentially affected by Dr. Kogan's unauthorized transfer of user data.

## 2. The District's Claims

This case relates to the adequacy of Facebook's privacy settings and disclosures with respect to the "friend-sharing" feature described above. The

District alleges that Facebook violated the CPPA in three ways. First, the District asserts that Facebook's privacy settings misled users by appearing to allow users to control what profile information was available to whom, when in fact Graph API's friend-sharing feature allowed third-party applications to access data through a user's friends. In the District's view, Facebook's Byzantine web of privacy settings and disclosures unintentionally misled consumers in violation of the CPPA.

Second, the District claims that Facebook's privacy disclosures unintentionally misled consumers by giving the false impression that Facebook had robust enforcement measures to audit third-party applications, when in reality it did not. In arguing that Facebook violated the CPPA, the District contrasts language in Facebook's policies stating that Facebook "c[ould] audit" a third-party application to "ensure [the] application is safe for users" with Facebook's alleged failure to conduct any meaningful oversight of third-party applications, including Dr. Kogan's.

Third, the District claims that Facebook made a material omission by belatedly disclosing that users' data was sold to Cambridge Analytica in violation of Facebook's policies. In the District's view, the failure to disclose that data had been sold (until three years after Facebook knew of the sale) gave users the false

impression that their data was safer than it was. As with the other two claims, the District alleges that this CPPA violation was unintentional.

### 3. Summary Judgment

Facebook moved for summary judgment on the District's claims. It argued that the District had failed to show by clear and convincing evidence that Facebook made any misleading representations, omissions, or ambiguous statements, or that any of the alleged statements or omissions were material. The District opposed Facebook's motion, arguing that it needed to prove its claims by only a preponderance of the evidence (not clear and convincing evidence) and that whether Facebook's statements were misleading was a question for the jury.

The trial court granted Facebook's motion for summary judgment. It concluded that the proper evidentiary standard for the District's CPPA claims was clear and convincing evidence. The court then explained that because "Facebook clearly disclosed all relevant terms in its policies," a "reasonable consumer could not have been misled as a matter of law." In short, because Facebook made accurate disclosures about friend sharing, no reasonable consumer could have been misled. As to Facebook's enforcement capabilities, the court explained that because Facebook "never guaranteed how it would proceed in an enforcement investigation," its accurate disclosures about how it *could* proceed could not as a matter of law have

misled users. Finally, the court concluded that Facebook had no duty to disclose the Cambridge Analytica data leak, such that its omissions did not constitute misrepresentations.

The trial court did "not reach the materiality element [of the CPPA] because a reasonable consumer could not have been misled, materially or not, [by] the accurate disclosures by Facebook."

### 4. Exclusion of Expert Report

Facebook had also moved to exclude the testimony of Dr. Schaub, the District's privacy expert. Dr. Schaub had applied three methods to determine whether Facebook's privacy disclosures adequately informed reasonable users. First, Dr. Schaub conducted a "content analysis": he analyzed "the content of written or visual materials," including Facebook's relevant disclosures in policy documents, to determine, based on his expertise and experience, whether those disclosures adequately informed a reasonable user of Facebook's friend-sharing feature. Second, using a computer program, Dr. Schaub assessed the "readability" of Facebook's disclosures to determine what reading skill level was required to comprehend those policies. Third, Dr. Schaub employed a "mental models" approach, which used the "form of disclosures" and a user's "experience" to reach

"conclusions about the effect of Facebook's relevant disclosures and user experience elements."

Facebook challenged Dr. Schaub's methods and the facts and data he relied on and characterized his report as speculative. After the District opposed Facebook's motion, defending Dr. Schaub's report, the trial court held a hearing on whether his testimony should be admitted. At the hearing, the discussion revolved around whether Dr. Schaub's opinion was the product of reliable principles and methods, with the trial court expressing deep skepticism of Dr. Schaub's methods and analysis, primarily with respect to content analysis. The court explained that it "fe[lt] like this is a guy who didn't employ . . . a scientific method [and to] the extent he deployed one, it was inconsistent with how he normally does it, how it's applied in the field."

As to Dr. Schaub's content analysis specifically, the trial court opined that it was "a lot of mumbo jumbo," because Dr. Schaub was merely "reviewing the document," and that instead of a reliable principle and method, the content analysis was "no more than [Dr. Schaub's] musings." The trial court noted that "even with the readability analysis," the court was skeptical of Dr. Schaub's method because it was "supposed to be reliable," but the court also expressed confusion and doubt about Facebook's challenge to the readability analysis. And as to Dr. Schaub's

mental models analysis, the court stated that, along with the content analysis, it seemed "really subjective" and was "really just [Dr. Schaub's] musings."

A week after the hearing, the trial court granted Facebook's motion to exclude Dr. Schaub's testimony in an order, stating that it was doing so "for the reasons stated in the opposition and in open [c]ourt" at the hearing.

## II.     Analysis

The District challenges the grant of summary judgment for Facebook and the exclusion of its expert witness.

## A.     Summary Judgment

The District argues that the trial court erred in granting summary judgment for Facebook. The District first contends that the trial court applied the wrong standard to its CPPA claims of unintentional misrepresentation because, in its view, it needed to prove those claims by only a preponderance of the evidence, as opposed to clear and convincing evidence. Further, the District argues that summary judgment was improper because genuine issues of material fact exist with respect to whether Facebook violated the CPPA in the three ways alleged by the District.

We agree with the District's first argument and therefore reverse and remand for reconsideration of the summary judgment motion, without reaching the District's second argument.

### 1.    Standard of Review

"We review a grant of summary judgment de novo and apply the same standard used by the trial court." *Nixon v. Ippolito*, 320 A.3d 1059, 1064 (D.C. 2024). Under this standard, the moving party has the burden of demonstrating that there is no genuine issue of material fact, after the evidence and all inferences from the evidence are drawn in favor of the non-moving party. *Id.* Our role is not to resolve factual issues as factfinder, "but rather to review the record to determine if there is a genuine issue of material fact on which a jury could find for the non-moving party." *Id.* (quoting *Mancuso v. Chapel Valley Landscape Co.*, 318 A.3d 547, 553 (D.C. 2024)).

### 2.    Discussion

In *Osbourne v. Capital City Mortg. Corp.*, 727 A.2d 322, 325-36 (D.C. 1999), we held that "the clear and convincing evidence standard applies to claims of intentional misrepresentation under the CPPA." At the time, it was assumed that alleged misrepresentations under the CPPA had to be intentional. *See Caulfield v.*

*Stark*, 893 A.2d 970, 976-77 (D.C. 2006) (explaining that whether "unintentional misrepresentation[s]" are actionable "under the CPPA is still an open question"). Our decision in *Osbourne* to apply the clear-and-convincing standard to CPPA claims involving intentional misrepresentations was premised on the principle that "no statute is to be construed as altering the common law," and the common law required clear and convincing evidence for claims of intentional misrepresentation. 727 A.2d at 325 (citation modified).

Nearly a decade after we decided *Osbourne*, we concluded that, in light of the plain language and the legislative intent of the CPPA, a consumer need not allege an intentional misrepresentation of a material fact or an intentional failure to disclose a material fact under certain provisions of the CPPA—D.C. Code § 28-3904(e) and (f). *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1073 (D.C. 2008); *see Frankeny v. District Hosp. Partners, LP*, 225 A.3d 999, 1002 (D.C. 2020) ("Under D.C. Code § 28-3904(e) and (f), a plaintiff-consumer 'need not allege or prove intentional misrepresentation or failure to disclose to prevail on a claimed violation of' the CPPA." (quoting *Fort Lincoln*, 944 A.2d at 1073)). That is, *Fort Lincoln* allowed some CPPA claims to be based on unintentional misrepresentations. But in *Fort Lincoln*, we did not address the burden of proof applicable to CPPA claims based on unintentional misrepresentations.

In *Frankeny*, we observed that the "burden of proof for CPPA claims is clear and convincing evidence." 225 A.3d at 1005 (citing *Pearson*, 961 A.2d at 1073). *Frankeny*, moreover, was a case involving unintentional misrepresentations under the CPPA. *Id.* at 1008. Accordingly, *Frankeny* could be read as holding that the burden of proof for claims of unintentional misrepresentations under the CPPA also is clear and convincing evidence.

We conclude, however, that *Frankeny* did not decide the burden of proof applicable to claims of unintentional misrepresentations under the CPPA and is not binding on the question. *Pearson*, the case *Frankeny* cited, was an intentional misrepresentation case. 961 A.2d at 1074-75. *Frankeny* included no discussion of the differences between intentional and unintentional misrepresentations and the reasoning behind application of a clear and convincing burden for both types of misrepresentations. And our review of the briefing in the case reveals that neither party raised the issue. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). "A point of law merely assumed in an opinion, not discussed, is not authoritative." *Id.* (quoting *In re Stegall*, 865 F.2d 140, 142 (7th Cir. 1989)).

Accordingly, we turn to the question of the appropriate burden of proof for claims of unintentional misrepresentations under the CPPA. And we conclude that CPPA claims based on unintentional misrepresentations need only be proved by a preponderance of the evidence, as opposed to clear and convincing evidence. "In civil litigation, a party with the burden of persuasion on an issue must ordinarily establish the relevant facts by a preponderance of the evidence" and exceptions "to this standard are uncommon." *Raphael v. Okyiri*, 740 A.2d 935, 957 (D.C. 1999) (citation modified).[1] One of those exceptions is common-law fraud, as we acknowledged in *Osbourne*. 727 A.2d at 325 (explaining that a "common law claim" for intentional misrepresentations must be proved by clear and convincing evidence). But claims based on unintentional misrepresentations are, by definition, not subject to the intentional misrepresentation exception to the general rule that civil litigants may prove their claims by a preponderance of the evidence. Accordingly, such claims need only be proved by a preponderance of the evidence.[2]

---

[1] "The phrases 'burden of proof' and 'burden of persuasion' have been interpreted generally to have the same meaning." *In re Bedi*, 917 A.2d 659, 666 n.10 (D.C. 2007).

[2] We are not alone in this conclusion. At least one state allows unintentional misrepresentation claims (under that state's Franchise Investment Protection Act) to "be evaluated under a preponderance of the evidence standard as opposed to the more stringent clear, cogent, and convincing evidence standard required for proof of common law fraud." *Kirkham v. Smith*, 23 P.3d 10, 13 (Wash. Ct. App. 2001).

Because the District's CPPA claims against Facebook are based on unintentional misrepresentations, the District may prove its claims by a preponderance of the evidence. The trial court's conclusion on summary judgment that a higher burden—clear and convincing evidence—applied was therefore erroneous, and it is not clear to us whether the trial court would have reached the same conclusion on summary judgment had it held the District to a preponderance standard. "Mindful that we are a court of review, not of first view," *Johnson v. United States*, 302 A.3d 499, 501 (D.C. 2023) (citation modified), we conclude that a remand is warranted for the trial court to apply the preponderance standard in the first instance. *See also Bailey v. United States*, 251 A.3d 724, 730 (D.C. 2021) (per curiam) (Where the trial court's "articulations are in serious tension with a preponderance standard, . . . that is enough to justify a remand for the trial court to clarify its ruling now that we have made the appropriate standard clear.").

## B.     Expert Testimony

The District argues that the trial court abused its discretion in excluding Dr. Schaub's testimony because the court failed to provide sufficient reasoning for its decision and because the testimony is admissible under *Motorola Inc. v. Murray*, 147 A.3d 751 (D.C. 2016) (en banc). Facebook counters by pointing to the trial

court's comments in the hearing to argue that the court properly exercised its discretion in deeming Dr. Schaub's methods unreliable.

### 1. Standard of Review

We review a trial court's decision excluding expert testimony for abuse of discretion, affording the trial court a great degree of deference. *Faltz v. United States*, 318 A.3d 338, 347 (D.C. 2024). "In reviewing for abuse of discretion, we must determine whether the decision maker failed to consider a relevant factor, whether the decision maker relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Bishop v. United States*, 310 A.3d 629, 641 (D.C. 2024) (citation modified).

### 2. Discussion

In deciding the admissibility of expert testimony, the trial court must consider whether:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

*Faltz*, 318 A.3d at 348 (quoting *Motorola*, 147 A.3d at 756); *see* Fed. R. Evid. 702. "*Motorola* states that Rule 702 expressly requires the trial court to determine whether an expert reliably applied principles and methods to the case at hand." *Faltz*, 318 A.3d at 348 (citation modified). "The Rule . . . elevates the trial judge's role as gatekeeper; it essentially provides that when a party proffers expert scientific testimony, the trial court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Lewis v. United States*, 263 A.3d 1049, 1059 (D.C. 2021) (internal quotation marks omitted). When a trial court does not substantively address the admissibility of an expert witness by applying Rule 702 or *Motorola*, "a remand for further analysis as required under *Motorola* is necessary." *Faltz*, 318 A.3d at 348.

The trial court's written order, referring only to the reasons "stated in the opposition and in open [c]ourt" at the hearing, complicates meaningful appellate review.[3] It places the burden on this court to parse the trial court's statements at the hearing to determine whether the court conducted a proper *Motorola* analysis and

---

[3] The District suggests that the trial court's reference to "the opposition" makes little sense because "the District's *opposition* to [Facebook's motion to exclude] cannot provide an explanation for why the court granted" Facebook's motion. We construe the trial court's statement as referring to Facebook's motion, which was in opposition to the admission of Dr. Schaub's testimony.

what deficiencies the trial court found with respect to each of Dr. Schaub's methods. *See, e.g.*, *Ealey v. Ealey*, 596 A.2d 43, 46 (D.C. 1991) ("A trial judge must make findings of fact and conclusions of law with respect to every material issue that is raised; otherwise meaningful appellate review cannot occur and this court must remand the case or the record."). *Cf. Faltz*, 318 A.3d at 348 (explaining that a conclusory statement in ruling excluding expert witness required remand for further analysis as required under *Motorola*).

To be sure, the trial court's statements at the hearing allow us to glean the court's thinking to some extent. For the most part, however, the trial court's comments reflect general doubt that Dr. Schaub applied the scientific method when conducting content analysis. The court made limited comments about the mental models approach, but it appeared to group it with the content analysis, saying that it is "really subjective," "just his musings," and "his analysis call[ed] something else."

The hearing transcript reveals little discussion of the readability analysis. Although the trial court remarked that the readability analysis is "supposed to be reliable" and "they never did a quality assessment," it subsequently expressed confusion, if not skepticism, about Facebook's complaint about the analysis and then moved on without stating why Dr. Schaub's readability analysis did not pass muster. Thus, it appears that the trial court did not engage in any meaningful *Motorola*

analysis with respect to at least the readability analysis and possibly the mental models approach and may instead have been "throwing out the good with the bad." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 96 (1st Cir. 2014).

Ultimately, we do not say whether Dr. Schaub's testimony is admissible in its entirety, but we can say that the record does not support the conclusion that the testimony is *inadmissible* in its entirety. *Cf. City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564 (11th Cir. 1998) (Although some grounds cited by trial court were sufficient to warrant the exclusion of parts of an expert's testimony, "none of these grounds is sufficient to warrant the exclusion of [the] testimony in its entirety (as would, for instance, a finding that [the expert] was not qualified to testify as an expert in [the relevant field])."). Accordingly, we reverse the trial court's order excluding Dr. Schaub's testimony in its entirety and remand for further analysis and explanation.

## III. Conclusion

For the foregoing reasons, we reverse and remand for further proceedings consistent with this opinion.

*So ordered.*